417 F.2d 106
 69-2 USTC P 9666
 COMMISSIONER OF INTERNAL REVENUE, Petitioner-Respondent,
v.
The ESTATE of H. W. DONNELL, Deceased, Willie Hayden
Donnell, Executrix and Willie Hayden Donnell,
Respondents-Petitioners.
The ESTATE of H. W. DONNELL, Deceased, Willie Hayden
Donnell, Executrix and Willie Hayden Donnell,
Respondents-Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Petitioner-Respondent.
 No. 25835.
 United States Court of Appeals Fifth Circuit.
 Oct. 10, 1969.
 
 Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Richard C. Pugh, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., Lee A. Jackson, Harris Weinstein, Stephen H. Paley, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D.C., Lester R. Uretz, Chief Counsel, IRS, Washington, D.C., for petitioner-respondent.
 Harold D. Rogers, Wichita Falls, Tex., for respondents-petitioners.
 Before GOLDBERG and MORGAN, Circuit Judges, and LIEB, District Judge.
 GOLDBERG, Circuit Judge:
 
 
 1
 In this case we engage the occult mysteries of oil and gas taxation regarding intangible drilling and development costs, depletion, and that alphabetical mystique, the ABC transaction. The taxpayers, H. W. Donnell and Willie H. Donnell, were husband and wife during the years 1959 through 1963. H. W. Donnell died in 1966, and Willie H. Donnell is the executrix of his estate. The taxpayers owned leasehold working interests in oil and gas properties and used the cash method of accounting and reporting their income and expenses from their oil and gas business. This case concerns the propriety of certain deductions and exclusions from taxable income taken by the taxpayers in computing their income from two of these leases during the years 1959 through 1963.
 
 The Ephriam Lease
 
 2
 The taxpayers owned an undivided one-half of a 7/8ths working interest in the Ephriam Lease in Rusk County, Texas, operated by J. D. Laird. Eleven wells were surfaced on this lease. In October, 1962, the Texas Railroad Commission ordered four of these wells shut in because it was discovered that the wells were bottomed in producing oil sands which were outside the vertical extensions of the surface boundaries of the Ephriam leasehold.
 
 
 3
 I. Depletion. The taxpayers claimed percentage depletion deductions with respect to all the income received by them from all of the wells located on the surface of the Ephriam Lease. The Commissioner disallowed for the years 1961 and 1962 that portion of the claimed deductions which he alleged were attributable to the sales of oil produced by the wells bottomed outside of the taxpayers' leasehold. The Tax Court affirmed the Commissioner's disallowance, holding that the taxpayers should receive depletion deductions only from the seven non-deviated wells and not from the four deviated wells. The taxpayers seek reversal. Agreeing with the Tax Court, we affirm. We hold that the depletion deduction is not allowed with respect to income from the sale of oil extracted from property in which the taxpayers have no economic interest.
 
 
 4
 The taxpayers claimed the depletion deduction pursuant to Internal Revenue Code 613(a)[1] which authorizes percentage depletion. In determining whether a person is entitled to depletion under this section the United States Supreme Court has consistently held that the taxpayer must have some economic interest in the minerals in place in order to apply the depletion deduction to income generated by the extraction of the minerals. Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897; Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489. Absent this requirement the depletion allowance could not perform its obvious purpose of allowing the owner of minerals to recoup his capital investment as the minerals are mined. In Commissioner of Internal Revenue v. Southwest Exploration Co., supra, the court explained the purpose of the depletion allowance:
 
 
 5
 'An allowance for depletion has been recognized in our revenue laws since 1913. It is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit. Presently, the depletion allowance is a fixed percentage of gross income which Congress allows to be excluded; this exclusion is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired.' Id. 350 U.S. at 312, 76 S.Ct. at 397.
 
 
 6
 In accord with this purpose the treasury regulations provide that 'Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber.' Treas.Reg. 1.611.1(b). Despite the difficulties often encountered in applying the somewhat elusive concept of 'economic interest,' we think it clear enough that one who reaches out underground to poach upon another's oil does not have the required interest in the purloined mineral to justify granting the depletion allowance. Furthermore, our recent case of Harrington v. Commissioner of Internal Revenue, 5 Cir. 1968, 404 F.2d 237, which also involved an illegally deviated well, unquestionably denies Donnell's quest for depletion. In Harrington we said:
 
 
 7
 'To qualify for the depletion allowance, a taxpayer must have 'acquired, by investment, any interest in the oil in place,' and secured, 'by any form of legal relationship, income derived from the extraction of the oil, to which he might look for a return of his capital.' Palmer v. Bender, 1933, 287 U.S. 551, 557, 53 S.Ct. 225, 226. Appellants do not have the required interest in the oil pumped from the slanted wells in order to take the depletion allowance because the income derived from the extraction of the oil was not 'secured by any form of legal relationship.' Rather, the income from the oil was derived from a tortious conversion of neighboring landowners' oil (case cited).' Id. at 239.
 
 
 8
 The necessity for some economic interest in the minerals and Donnell's demonstrable lack of such an interest is so obvious that the taxpayers do not even argue that they are entitled to the depletion deduction under the statute. Rather, as we understand the taxpayers' argument, they assert that since they were required to report the entire income from the property as their income under the 'claim of right' doctrine they were, therefore, entitled to the depletion deduction. They argue, apparently on the basis of Internal Revenue Code 1341,[2] that the Commissioner can require a taxpayer to restore the amount of the depletion deduction only in the year he is required to restore the past oil sales to the rightful owner. Thus, the taxpayers would have us read 1341 so that they are required to give back an illegal deduction only when they are required to restore the illegal income from which the deduction was taken. We do not read 1341 to require such a result. That section is to provide a tax adjustment when income is declared and taxed in one year and in a subsequent year has to be returned. It operates upon a properly computed tax return which included as taxable income funds which later prove to be income attributable to and returned to another person. It has no application to the problem before us, which is whether a taxpayer, in computing the tax due for the year in which he claimed the funds as his own and was, therefore, required to include them as his taxable income, could properly take a depletion deduction on oil income when he had no economic interest in the oil. We hold that he could not. The Donnells had no economic interest in the oil extracted from the four wells bottomed off the Ephriam Lease. It was not their oil which was being depleted. They cannot, therefore, take a percentage depletion allowance in computing the tax due on the income from the sale of that oil.
 
 
 9
 Under the circumstances here the taxpayers are not entitled to depletion deduction based on 1341, but we make no comment concerning their other rights under that section.
 
 
 10
 II. Intangible drilling and development costs. The taxpayers also elected to expense rather than capitalize all of their drilling and development costs for the wells on the Ephriam Lease. In 1959 and 1960 the taxpayers paid the operator of the Ephriam Lease their share of the intangible drilling and development costs for the wells which the Texas Railroad Commission later found to be bottomed off of the Ephriam Lease. The Commissioner disallowed the deductions for these development costs on the ground that they were incurred for drilling wells not completed on the taxpayers' property. The Tax Court upheld the taxpayers' contention that the option provided in Internal Revenue Code 263 entitled them to deduct as expenses the intangible drilling and development costs of wells bottomed outside the Ephriam Lease. We agree with the Commissioner and reverse the Tax Court.
 
 
 11
 Internal Revenue Code 263(a) contains the general rule that 'any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate' must be capitalized and not expensed. Subsection c of 263, however, provides an exception which allows an option to expense intangible drilling and development costs in the case of oil and gas wells subject to regulations to be prescribed by the Secretary of the Treasury or his delegate. The pertinent regulations are Treasury Regulation 1.612-4(a) and 1.614-1(a).
 
 Section 1.612-4 provides:
 
 12
 'In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense.' Section 1.614-1(a)(2) provides:
 
 
 13
 'The term 'interest' means an economic interest in a mineral deposit. * * * The term includes working or operating interests, royalties, overriding royalties, production payments and net profits interests.'
 
 
 14
 Further, 614-1(a)(3) provides that the term 'tract or parcel of land' is merely descriptive of the physical scope of the land to which the taxpayer's interest relates.
 
 
 15
 The essence of the problem is whether or not under these regulations a taxpayer must have an economic interest in the minerals in place before he is eligible to exercise the 263(c) option and expense the intangible drilling and development costs necessary to produce those minerals. We think the regulation and past decisions clearly demonstrate that such an economic interest is necessary.
 
 
 16
 It is clear that the operator eligible for the expense deduction in Treasury Regulation 1.612-4 is one who holds a working interest which under Treasury Regulation 1.614-1(a)(2) & (3) is defined as an economic interest in a mineral deposit. It is therefore apparent that the intent of the regulation was to limit the expensing privilege to one hold limit the expensing privilege to one holding as that required for the depletion deduction.
 
 
 17
 The cases in this area arise for the most part out of the 'carried interest' device used to finance the drilling and development of oil properties. When this device is used, one party (the carrying party) agrees to advance all of the funds necessary to drill and produce the wells and to look only to the other owner's (the carried party) share of production to recoup the carried party's share of the costs. Various forms of mineral interest transfers between the carried and carrying parties are used. The ultimate aim is to give the carrying party all of the production proceeds until the carried party's share of the drilling costs are paid off. It was inevitable that disagreement would arise concerning which of the persons involved in such transactions were entitled to expense the capital investment for intangible drilling and development. The significant point applicable to the instant case is that despite some inconsistent results, in each of these carried interest cases the court resolved the controversies by seeking out the persons who owned an economic interest in the minerals in place and allowed those persons to expense the intangible drilling and development costs while denying the deduction to other parties. United States v. Cocke, 5 Cir. 1968, 399 F.2d 433, cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (March 24, 1969); Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir. 1961, 294 F.id 750; Wood v. Commissioner of Internal Revenue, 5 Cir. 1960, 274 F.2d 268; Prater v. Commissioner of Internal Revenue, 5 Cir. 1959, 273 F.2d 124; Commissioner of Internal Revenue v. J. S. Abercrombie Co., 5 Cir. 1947, 162 F.2d 338. Any lingering doubt as to whether or not the privilege to expense intangible drilling and development costs is inextricably tied to the same economic interest consideration required for the depletion deduction should have been dispelled by this court's decision in United States v. Cocke, supra, wherein we said:
 
 
 18
 'We now conclude * * * that depreciation and intangible drilling and development costs are subservient satellites of depletion in situations involving carried interests, and that, as the spoils go to the victor, so these deductions
 
 
 19
 (a) General rule.-- In the case of the 399 F.2d at 446.
 
 
 20
 In the case before us the taxpayers assert that they have the necessary economic interest because they own a working interest in the Ephriam Lease where the deviated wells were surfaced. We find this argument unconvincing. The definition of an operator given us by the Regulation is 'one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or other form of contract granting working or operating rights.' A tract or parcel of land is defined as 'the physical scope of the land to which the taxpayer's interest relates.' Another's land is scarcely property within the 'physical scope of the land to which the taxpayer's interest relates.' To hold otherwise would require us to give 'relate' a larcenous cast. Moreover, we look in vain for ownership, lease, or contractual rights giving Donnell the right to extract oil from his neighbor's land. Deviated drilling is not to be equated with fee interest, lease interest or contract interest. The contractual right to drill did not encompass lands of others. a working interest in the Ephriam Lease is not a working interest to lift oil from areas beyond that lease. Donnell's rights were limited to the vertical extension of the horizontal limits of his lease and beyond these boundaries he was a trespasser, not a statutory operator even though he was physically operating.
 
 
 21
 In addition, quite apart from the regulations, the whole purpose of the expensing privilege would be thwarted if a depredator were allowed to exercise this option. A well is not a surface thing; it is a unit from spud to bottom. Harrington v. State of Texas, Tex.Civ.App. 1965, 385 S.W.2d 411, rev. on other grounds, State v. Harrington, Tex.1966, 407 S.W.2d 467, cert. denied, 1967, 386 U.S. 944, 87 S.Ct. 977, 17 L.Ed.2d 874. The costs of drilling and developing a well do not occur in isolation. Rather, they are incurred in order to produce minerals from a definitely defined subsurface area and it is the economic interest in the minerals which gives rise to the special deductions. Here Donnell not only had no economic interest in the minerals the deviated wells produced; he defied the legal interest of others. He was an unlicensed and uninvited volunteer who extracted under no color of right, contractual or otherwise. The deviated wells from top to bottom did not develop the subsurface area in which Donnell had an interest; hence the costs of these wells cannot be expensed under Internal Revenue Code 263(c) and Treasury Regulation 1.612-4(a). One must pick grapes in his own vineyard before he has that economic interest which endows him with the option to expense intangibles.
 
 
 22
 The taxpayers further argue that they should be allowed to write off the intangible costs of the wells under 1.612-4(4) as dry or faulty wells. Treasury Regulation 1.612-4(4) provides for a second option if (1) the operator elected to capitalize drilling and development costs and (2) the well was dry or faulty. In this case neither requirement was met. Donnell elected to expense, not capitalize, the costs. The well was not dry or faulty; it was a producer illegally slanted into his neighbor's property. Further, the regulations clearly indicate that this second option is available only to those operators who could have elected to expense the intangible costs initially. Our holding that the Donnells lacked a sufficient economic interest to expense the costs initially also prevents them from exercising the second option to expense the costs of the wells as dry or faulty wells.
 
 
 23
 Taxpayers finally assert that since the Commissioner allowed them to deduct the expenses of operating the wells during production, they should be allowed the option to expense intangible drilling and development costs. We find this argument also unpersuasive. Under Commissioner of Internal Revenue v. Sullivan, 1958, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559, one operating an illegal business is entitled to deduct the ordinary expenses of doing business in computing taxable income. It was only these ordinary expenses of doing business which the Commissioner allowed here. The allowance of such expenses has no relationship to the special option in 263(c) which permits a taxpayer to expense what is admittedly a capital expenditure. Ordinary expenses an illegal operator may take. The special privilege to deduct as expenses the capital investment in drilling and developing an oil well is restricted to those operators developing minerals in which they have an economic interest. We do not have before us the question concerning the proper tax treatment of Donnell's capital investment which was lost when the Texas Railroad Commission ordered the wells shut in.
 
 The Fleming Lease
 
 24
 In addition to the taxpayers' difficulties involving the depletion and intangible expense deductions on the Ephriam Lease, the taxpayers have a third problem involving another lease. On January 11, 1961, J. A. Fleming assigned to H. W. Donnell all of his interest in certain oil and gas leasehold production located in Gregg County, Texas. Donnell paid Fleming $6,225 in cash and Fleming reserved a production payment of $35,275 payable out of 85% Of all minerals produced from the assigned properties plus interest at 6 1/2% Per annum on the unrecovered balance of the principal.
 
 
 25
 Fleming sold the production payment to the Calm Corporation for $35,275. The Calm Corporation borrowed $35,275 from the Texas Bank and Trust Company of Dallas to finance this purchase and as security for the loan gave the bank a deed of trust conveying the production payment to a trustee for the bank. On the same day that all of these other transactions occurred, January 11, 1961, Donnell agreed by letter that he would, if requested, purchase the unpaid balance of the Calm Corporation's note from the bank or the unliquidated balance of the production payment from the Calm Corporation. Donnell was never requested to make either purchase, and the production payment was paid out in full from the lease proceeds by June 23, 1964. During the payout period 85% Of all income from the Fleming Lease was received by the bank to repay the Clam Corporation's loan. During these years, 1961 through 1963, the taxpayers declared in their tax returns only the 15% They directly received from the leasehold production.
 
 
 26
 The Commissioner determined that the Donnells received taxable income not only from this 15% But also constructively received the 85% Paid to liquidate the reserved production payment. The Commissioner based his finding on Donnell's takeout letter, asserting that by the terms of that letter Donnell assumed all risk of loss from a failure of the lease to pay off the production payment and thereby acquired a depletable interest in the minerals and constructively received the income produced by the sale of those minerals. The Tax Court sustained the Commissioner's determination and we affirm the Tax Court.
 
 
 27
 The taxpayers assert that since they had no legal right to the income and made no investment in the production payment, the income reserved by the production payment should not be attributed to them. Thus the taxpayers seek a tax shelter in the haven and refuge of what appears to be a reserved production payment in an ordinary ABC transaction.
 
 
 28
 We must begin our analysis of the effect of Donnell's takeout letter with the primogenital case of Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324, which first dealt with the tax treatment of a reserved production payment. In Perkins, the assignor transferred to Perkins an oil and gas lease for cash plus a production payment of $395,000 to be paid out of 25% Of all oil produced. Significantly, the agreement provided that the $395,000 'is payable out of oil only * * * and said oil payment does not constitute and shall not be a personal obligation of the assignee * * *.' Id. at 657, 57 S.Ct. at 912. Perkins drilled wells on the lease and produced oil. In his tax return Perkins did not include as his income any part of the proceeds allocated to the production payment. The Commissioner, however, determined that these amounts should have been included in Perkins' income with a concomitant depletion allowance. In holding that no part of the income reserved by the production payment should be included in Perkins' income, the Supreme Court said:
 
 
 29
 'The provisions for payment to assignors in oil only, the absence of any obligation of the assignee to pay in oil or in money, and the failure of assignors to take any security by way of lien or otherwise unmistakably show that that they intended to withhold from the operation of the grant one-fourth of the oil to be produced and saved up to an amount sufficient when sold to yield $395,000.' Id. at 659, 57 S.Ct. at 912.
 
 
 30
 On the other hand a contrary result was reached by the Supreme Court in Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, a case which factually differs only slightly from Perkins. In Anderson the vendor, Oklahoma Company, sold the taxpayer certain oil interests for $50,000 cash and $110,000 to be paid from 'one-half of the proceeds * * * derived from the oil and gas produced from the properties and from the sale of fee title to any or all of the land conveyed.' Id. 405-406, 60 S.Ct. at 953. The taxpayer paid the Oklahoma Company one-half of the lease proceeds as they were earned. The issue was whether the taxpayer should have included these funds as well as his own share of the proceeds in his taxable income.
 
 
 31
 In holding that the taxpayer should have included one hundred percent of the lease proceeds in his taxable income the court said:
 
 
 32
 'It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest (cases cited).' Id. at 407, 60 S.Ct. at 954.
 
 
 33
 In applying this rule to the facts in Anderson the court was explicit in holding that the production payments constitute income to their holder only when they are payable solely out of oil production.
 
 
 34
 'The reservation of an interest in the fee, in addition to the interest in the oil production, however, materially affects the transaction. Oklahoma Company is not dependent entirely upon the production of oil for the deferred payments; they may be derived from sales of the fee title to the land conveyed. It is clear that payments derived from such sales would not be subject to an allowance for depletion of the oil reserves, for no oil would thereby have been severed from the ground; an allowance for depletion upon the proceeds of such a sale would result, contrary to the purpose of Congress, in a double deduction-- first, to Oklahoma Company; second, to the vendee-owner upon the production of oil. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 176, 79 L.Ed. 312, 383, 388. We are of opinion that the reservation of this additional type of security for the deferred payments serves to distinguish this case from Thomas v. Perkins. It is similar to the reservation in a lease of oil payment rights together with a personal guarantee by the lessee that such payments shall at all events equal the specified sum. In either case, it is true, some of the payments received may come directly out of the oil produced. But our decision in Thomas v. Perkins does not require that payments reserved to the transferor of oil properties shall for tax purposes be treated distributively, and not as a whole, depending upon the source from which each dollar is derived. An extension of that decision to cover the case at bar would create additional, and in our opinion unnecessary difficulties to the allocation for income tax purposes of such payments and of the allowance for depletion between transferor and transferee. In the interests of a workable rule, Thomas v. Perkins must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. The deferred payments reserved by Oklahoma Company, accordingly, must be treated as payments received upon a sale to petitioners, not as income derived from the consumption of its capital investment in the reserves through severance of oil and gas.
 
 
 35
 'Petitioners, as purchasers and owners of the properties, are therefore taxable upon the gross proceeds derived from the oil production, notwithstanding the arrangement to pay over such proceeds to Oklahoma Company. * * *' Id. at 413, 60 S.Ct. at 956.
 
 
 36
 The rule clearly is that the oil reservoir as defined by the oil payment must be, without further frills and furbelows, the sole source of the payout, in order for the ABC transaction to hold and become a Perkins, rather than an Anderson type interest.
 
 
 37
 Applying this rule we conclude that in the instant case Calm Corporation owned an Anderson type production payment which is not an economic interest in the oil in place. On the same day that Fleming sold the production payment to Calm Corporation, Donnell wrote the bank and Calm agreeing to purchase the note or the production payment. The purpose of Donnell's takeout letter is expressed as 'an inducement to the Calm Corporation to purchase said production payment from J. H. Fleming and as an inducement to Texas Bank & Trust Company of Dallas to loan Calm Corporation the moneys with which to purchase said Production Payment.' This guaranty insulated both the bank and Calm Corporation from any loss which might occur if lease production was insufficient to liquidate the production payment. Thereafter, neither the bank nor Calm looked solely to the oil production for a return of their funds; each could look to Donnell. As a result, under the Anderson rule neither Calm nor the bank had an economic interest in the mineral deposit. The income is not attributable to them and no depletion is allowed them.
 
 
 38
 Donnell, on the other hand, by executing the takeout letter personally guaranteed the production payment upon failure of the lease to produce in sufficient quantities. He assumed the risk of non-production and looked solely to production for the return of his investment. Donnell thereby acquired the economic interest in the oil in place and was chargeable with all of the income from the Fleming Lease. United States v. Cocke, 5 Cir. 1968, 399 F.2d 433, cert. denied, 394 U.S. 922, 89 S.Ct. 1187, 22 L.Ed.2d 455 (March 24, 1969); Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir. 1961, 294 F.2d 750.
 
 
 39
 The taxpayers argue, however, that such a conclusion is unsound because Donnell had no legal right to the income and made no investment in the production payment. We think this argument totally overlooks the effect of Donnell's takeout letter. Donnell was personally obligated to either the bank or Calm regardless of whether the lease produced in sufficient quantity. The 'production payment' was, therefore, tantamount to a mortgage. Donnell was unconditionally liable for $35,275 and this liability was Donnell's economic investment in the production payment.
 
 
 40
 The taxpayers also argue that the Tax Court's opinion in the case of George C. Landreth, 1968, 50 T.C. 803, stands for the proposition that a guaranty in an ABC transaction does not adversely affect the tax consequences of such transactions. We think the taxpayers have misread the meaning of that opinion. In Landreth the assignor of a production payment guaranteed its payment to the bank financing the purchase of the production payment. However, the court specifically found that the buyer of the payment was ultimately liable, through subrogation, to the vendor for payment if production failed and the bank sued on the vendor's guaranty. Hence, it was held that the purchaser and not the vendor was chargeable with the income from production. That decision conflicts in no way with our decision here. In both cases the income is allocated to the person who looks solely to production to recoup his capital investment, stands the risk of loss, and who, therefore, holds the economic interest in the oil in place.
 
 
 41
 Finally, we must decide whether or not the taxpayers are entitled to change the method of computing their depletion deduction for the years in question from percentage to cost, and if so, whether or not the depletion should be computed separately for the production payment and the working interest. We have concluded that the substance of Donnell's transactions regarding the Fleming Lease amounted to the purchase of a unitary working interest for which he paid $41,500. Accordingly we hold that the depletion calculations, whether cost or percentage, must be computed on this interest as a single unit.
 
 
 42
 Regarding the taxpayers' request to change their method of calculating the depletion deduction, we think that since our opinion substantially changed the quantity of he interest they are entitled to deplete, justice requires that we remand for the purpose of having cost depletion determined with respect to the entire production income allocated to the taxpayers from the Fleming Lease. The Donnells will then be in a position to comply with the mandate of Internal Revenue Code 613(a) and take cost depletion if that method produces the greater deduction.
 
 
 43
 The government argues, however, that the taxpayers should not be allowed to raise the issue of cost depletion at this stage. Though the taxpayers constantly, consistently, and persistently argued that the production payment income was not attributable to them, they did plead, perhaps obliquely, that in the event the income was attributable to them, they would be entitled to cost depletion. The government asserts that this contention was limited to the production payment as a separate interest. Whether the pleading was aimed at the production payment or the entire income, the issue concerning cost depletion on whatever interest Donnell was entitled to deplete was fairly raised.
 
 
 44
 The government counters, however, with the argument that since the taxpayers could have presented evidence on cost depletion on the whole interest and did not, they should be silenced. This we are urged is in the interest of ending litigation. Aware and conscious of this principle as we are, we nevertheless believe that the repose of litigation must not always be at the expense of justice. Hormel v. Helvering, 1941, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037. Courts have frequently remanded for further fact findings when, as here, the disposition of a case causes a fact previously considered unimportant to become crucial Co-operative Grain and Supply Co. v. Commissioner of Internal Revenue, 8 Cir. 1969, 407 F.2d 1158; Road Materials Inc. v. Commissioner of Internal Revenue, 4 Cir. 1969, 407 F.2d 1121; Maxwell v. United States, 5 Cir. 1964, 334 F.2d 181; Harvey v. Commissioner of Internal Revenue, 9 Cir. 1949, 171 F.2d 952. See generally, 9 J. Mertens, Law of Federal Income Texation 51.27. Moreover, we note that on occasions when the shoe pinches the Commissioner, he clamors for justice by way of remand. Commissioner of Internal Revenue v. Estate of Nelson, 2 Cir. 1968, 396 F.2d 519.
 
 
 45
 Affirmed in part, reversed in part, remanded in part.
 
 
 
 [1]
 Int.Rev.Code Sec. 613. (1961-1962 version)
 Percentage depletion.
 (a) General rule.-- In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * * In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.
 
 
 [2]
 Int.Rev.Code. Sec. 1341 (1961-1962 version) Computation of tax where taxpayer restores substantial amount held under claim of right
 (a) General rule.-- If--
 (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;
 (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and
 (3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following:
 (4) the tax for the taxable year computed with such deduction; or
 (5) an amount equal to--
 (A) the tax for the taxable year computed without such deduction, minus
 (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years). For purposes of paragraph (5)(B), the corresponding provisions of the Internal Revenue Code of 1939 shall be chapter 1 of such code (other than subchapter E, relating to self-employment income) and subchapter E of chapter 2 of such code.