**C. B. and Ida N. CHRISTIE, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 29796.**

United States Court of Appeals, Fifth Circuit.

Jan. 27, 1971.

---

2. This return was filed jointly by Peter F. Balistrieri and Mary Balistrieri.

Eldon B. Mahon, U. S. Atty., Dallas, Tex., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, William S. Estabrook, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Eugene G. Sayre, Atty., Tax Div., Fort Worth, Tex., for appellant.

Harold D. Rogers, Wichita Falls, Tex., for appellees.

Before RIVES, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

The Government appeals from an adverse District Court decision in favor of Taxpayers, C. B. and Ida N. Christie, on their claim for refund of income taxes paid for the calendar year 1964. At issue is the question of ownership of an economic interest in oil in place on property covered by a certain mineral lease in Texas. The District Court held that an assignment of an oil production payment by Taxpayers to Waldo E. Karrenbrock transferred an economic interest[1] to him, so that the oil production income attributable to the payment was not taxable to Taxpayers. We reverse.

The facts were stipulated by the parties and, as found by the District Court, are summarized as follows:

During the year 1964 Taxpayers owned an undivided ⅜ interest of the working interest in the oil and gas lease known as Mangold Lease, located on property situated in Archer County, Texas. On August 1, 1964, Taxpayers and the owners of the additional ⅝ working interest[2] entered into a written oil payment contract with Waldo E. Karrenbrock under which he agreed to furnish certain equipment, such as flow lines, water pumps and pumping units, in the aggregate sum of $5,235.24, to be used on wells in the production of oil from the lease. In consideration of the foregoing, Taxpayers jointly assigned and conveyed to Karrenbrock an oil production payment[3] payable out of 80 per cent of all of the oil and/or gas produced from the interest owned by them in the Mangold Lease until the market value of said oil and/or gas aggregated the sum of costs to be incurred by Karrenbrock in purchasing and installing the equipment, plus a 5 per cent commission and a 5½ per cent annual interest on such costs. The oil payment assignment also provided that

---

1. "Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. * * *" Treas.Reg. § 1.611–1(b).

2. The remaining working interest in the Mangold Lease was owned as follows: C. B. Christie, Jr., 17/32; Eleanor Christie Trust, 3/32.

3. "A production payment, for federal tax purposes, is a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money (which may be determined by a formula) or a specified number of units of oil or gas has been received. * * *" Breeding and Burton, Income Taxation of Oil and Gas § 2.07 (1961).

"In the event that any equipment which has been furnished by Second Party [Karrenbrock] is salvaged from the said leases above described, the Second Party may, at his option, elect to have the proceeds from the sale of any or all such equipment applied on the reduction of the oil payment herein reserved."

Prior to the assignment, Karrenbrock was furnished a schedule showing that the oil runs from the Mangold Lease for the 26-month period preceding the assignment averaged between $10,000 to $11,000 per month. In accordance with the terms of the assignment, Karrenbrock furnished equipment in the total amount of $5,235.24 to be used for the production of oil from that lease. On September 9, 1964, he paid for that equipment with funds borrowed from the First Wichita National Bank, Wichita Falls, Texas, in the amount of $5,235.24 at an interest rate of 6 per cent per annum. On September 24, 1964, Karrenbrock received the sum of $5,510.95 from the August oil runs from the lease. On the following day he repaid the bank the sum of $5,249.20 which represented full payment of principal and interest due. Karrenbrock included the sum of $261.75, the difference between the sum expended by him and the sum realized from the oil payment, in his gross income for 1964.

Of the total amount paid by Karrenbrock for equipment, $1,963.22 was attributable to Taxpayers' undivided ⅜ interest in the Mangold Lease. In their 1964 income tax return, Taxpayers did not claim depreciation for the equipment furnished by Karrenbrock. The District Director, in a 30-day letter, increased Taxpayers' income from the lease by $2,066.60, representing ⅜ of the $5,510.95 received by Karrenbrock. Taxpayers paid the additional assessment and filed a claim for refund, which was disallowed by the Commissioner. They then filed this action for the recovery of the additional assessment plus interest.

To determine who is the owner of a depletable and taxable economic interest in oil in place[4] decisions of the Supreme Court have relied on two interrelated concepts: The taxpayer must have "(1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his capital.'" Commissioner of Int. Rev. v. Southwest Explor. Co., 350 U.S. 308, 313, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956); Thomas v. Perkins, 301 U.S. 655, 661, 57 S.Ct. 911, 913, 81 L.Ed. 1324 (1937); Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489 (1933). The second concept has been interpreted by the Supreme Court to mean "that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital." Southwest Explor. Co., supra, 350 U.S. at 314, 76 S.Ct. at 399; Anderson v. Helvering, 310 U.S. 404, 412, 60 S.Ct. 952, 956, 87 L.Ed. 1277 (1940).

In Thomas v. Perkins, supra, the Supreme Court considered for the first time, as far as we can ascertain,[5] the tax treatment to be accorded a reserved oil production payment. In that case, Perkins was the assignee of a mineral lease under an assignment reserving to the assignors a production payment of $395,000 "payable out of oil only." *Id.*, 301 U.S. at 657, 57 S.Ct. at 912. He failed to include as income in his tax return the proceeds allocated to the production payment. The Commissioner, however, determined that such income, subject to depletion, should have been included by him. A decision by the District Court adverse to Perkins was reversed by this Court and the Supreme Court affirmed, deciding that the holders of the production payment, and not

---

4. Title 26 U.S.C. § 611, Internal Revenue Code of 1954, sets out the deduction allowances for depletion of minerals, oil and gas wells, other natural deposits and timber.

5. See C. I. R. v. Estate of Donnell, 5 Cir., 1969, 417 F.2d 106, 113.

Perkins, were chargeable with the income from that interest. *Id.*, 301 U.S. at 663, 57 S.Ct. at 914.

In Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952 (1940), the transferee and owner of certain mineral interests, Anderson (whose assignor, Oklahoma City Company, had retained an oil production payment), and not the production payment holder, was held taxable on the proceeds derived from the oil production. The reason the Court gave for this result was that the contract between the parties provided for payment to Oklahoma City Company out of proceeds "which might be derived from oil and gas produced from the properties *and from the sale of fee title to any or all of the land conveyed.*" *Id.*, 310 U.S. at 405, 406, 60 S.Ct. at 953. (Emphasis supplied.) This second source of recoupment caused the Court to distinguish the case from *Perkins*, in holding:

> "The reservation of an interest in the fee, in addition to the interest in the oil production, however, materially affects the transaction. Oklahoma Company is not dependent entirely upon the production of oil for the deferred payments; they may be derived from sales of the fee title to the land conveyed. * * * We are of opinion that the reservation of this additional type of security for the deferred payments serves to distinguish this case from Thomas v. Perkins. * * * In the interests of a workable rule, Thomas v. Perkins must not be extended

beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas."

*Id.*, 310 U.S. at 412, 413, 60 S.Ct. at 956.[6] In holding that all of the lease proceeds were taxable to Anderson, the Court said:

> "It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest."

*Id.*, 310 U.S. at 407, 60 S.Ct. at 954.

In Commissioner v. Estate of Donnell, 5 Cir., 1969, 417 F.2d 106, this Court followed the reasoning in *Anderson,* and held the owner of mineral interests, rather than the production payment holder, taxable on production payments where the mineral interest owner's sole source for a return of his investment was production. In *Donnell,* J. A. Fleming assigned to H. W. Donnell for cash all of his interest in certain oil and gas leasehold production, reserving to himself a production payment. Fleming, in turn, sold the production payment to Calm Corporation which financed the purchase through a bank loan. As security for the loan Calm Corporation gave the bank a deed of trust conveying the production payment to a trustee for the

---

6. See also this Court's decision in C. I. R. v. Estate of Donnell, 5 Cir., 1969, 417 F. 2d 106, 115, in which we said:

"The rule clearly is that the oil reservoir as defined by the oil payment must be, without further frills and furbelows, the sole source of the payout, in order for the ABC transaction to hold and become a *Perkins,* rather than an *Anderson* type interest."

The instant case does not partake of the elements of an "ABC" transaction, in which the seller of a mineral interest receives a capital gains advantage. In the typical "ABC" transaction A sells his mineral interest to B, reserving or carving out an oil payment of a certain sum plus a stated amount for interest, and simultaneously sells that retained production payment to a third party. See George H. Landreth, 1968, 50 T.C. 803, 804, n. 1; Prentice-Hall, Federal Taxes, Vol. 3, 1970, ¶ 22013.

By recent amendment to the Internal Revenue Code, the tax treatment accorded to such transactions has been substantially changed. See 26 U.S.C. § 636. Pub.L. 91–172, Title V, § 503(a), Dec. 30, 1969, 83 Stat. 630.

bank. Donnell, in order to induce the purchase and the loan, agreed that he would, if requested, purchase the unpaid balance of the note from the bank or the unliquidated balance of the production payment from the Corporation. Donnell was never requested to make either purchase, and the production payment was paid out in full from the lease proceeds. However, because of these personal guarantees by Donnell, we held that "He assumed the risk of non-production and looked solely to production for the return of his investment. Donnell thereby acquired the economic interest in the oil in place and was chargeable with all of the income from the Fleming Lease." *Id.*, 417 F.2d at 115.

Turning now to the instant case, the Government contends that since Karrenbrock was not solely dependent upon production for payout because of his option to have the sale proceeds of any salvaged equipment applied in reduction of the oil payment, Taxpayers retained their economic interest in the oil allocable to the oil payment and were taxable on production thereof. In support of this argument the Government relies on the two Supreme Court decisions to which we have already referred, Commissioner of Int. Rev. v. Southwest Explor. Co., supra, and Anderson v. Helvering, supra, and this Court's decision in *Donnell*.

Taxpayers counter with the argument that because Karrenbrock was aware of the high oil production average of the Mangold Lease (approximately $10,000 monthly) he knew he would recover his investment solely from production within the first month of ownership and therefore looked to no other source for the return of his funds. Further, Taxpayers contend that the case is analogous to that of Weinert's Estate v. C.I. R., 5 Cir., 1961, 294 F.2d 750, which we distinguished from *Anderson*. In *Weinert* the owners of certain oil and gas leases (collectively referred to as Weinert) sold to certain corporations (collectively referred to as Lehman) an undivided ½ interest in the leases and a production payment payable out of proceeds from Weinert's retained half interest as well as from his interest in proceeds of a cycling plant to be built. The Commissioner argued that Weinert's right of recovery extended not only to mineral production but to the net profits from the cycling plant, and that therefore under the holding in *Anderson* Lehman did not possess the economic interest in the minerals in place that would shift the tax burden to him. We rejected that argument in holding that unlike *Anderson*, in which the alternative source of income was the sale of the surface fee, "something having no necessary relation to the mineral interest * * * Lehman had to recoup solely from the extraction and sale of the minerals." *Id.*, 294 F.2d at 763. "Here, the plant was * * * an indispensable part of the severance and sale of the gas and liquid hydro-carbons produced from the unitized leases." *Id.*, 294 F.2d at 764.

Taxpayers argue that the equipment (to which Karrenbrock could, but did not, look for recoupment) is, like the cycling plant in *Weinert*, an "indispensable part of the severance" of the minerals and therefore distinguishable from the alternative source, the surface fee, in *Anderson*. We do not consider Taxpayers' analogy to be tenable. It is true that the cycling plant in *Weinert* and the equipment furnished in the instant case were both used in the production of minerals, but in *Weinert* the production payment holder could look only to the production of minerals from the lease for his payout including those hydro-carbons processed through the cycling plant, and not to income which might be derived from the sale of the plant or its equipment. As the Court said in *Weinert*, "Lehman's investment was in the minerals, not the plant." 294 F.2d at 765. In the present case, the alternative source of income is the salvage value of the equipment, an important factor (not present in *Wei-*

*nert*) which creates a significant distinction between the cases. We find no conflict between our holdings in *Weinert* and *Donnell*. To the contrary, we cited *Weinert* as authority in holding that Donnell bore the risk of nonproduction, looked solely to production for the return of his investment, acquired the economic interest in the oil in place, and consequently was chargeable with the income from the Fleming Lease. 417 F.2d at 115. The significant common factor in *Anderson, Southwest Explor. Co., Donnell, Weinert* and the instant case, is that the party assuming the risk is the one who holds the economic interest, thereby sharing both the benefits of depletion and the burden of taxation.[7]

After a careful analysis of the facts and authorities cited, we conclude that the Taxpayers retained the economic interest in the oil allocable to the production payment and that the income accruing therefrom should be included in their taxable income, subject, of course, to any depreciation or depletion to which they may be entitled.

Reversed.

7. Taxpayers cite as authority, for the argument that the equipment furnished by Holbrook was not an "alternative source," the decision of the Tax Court in George H. Landreth, 1968, 50 T.C. 803. Landreth involved a form of "ABC" transaction, wherein Landreth (A) sold his mineral interests in oil and gas to Anderson and Hime (B), retaining a production payment which he then sold to Petroleum Investors, Ltd. (C), a going business with a net worth of over $300,000. In order to finance the purchase, C obtained a bank loan, for which it executed its note. To induce the bank (which was unaware of C's financial responsibility) to provide the loan to C, Landreth agreed that after a period of 36 months he would, upon demand by the bank purchase or find a purchaser for the unpaid principal and accrued interest on the note given by C. The Tax Court rejected the Government's contention that C could look to the guaranty, a source other than production, and held that the economic interest passed to C who bore the ultimate risk of loss from failure of production. Id., 50 T.C. at 809. Taxpayers contend by analogy that inasmuch as the personal guaranty of the holder's loan was not considered an "alternative source," it follows that the equipment furnished by Karrenbrock should not be considered so. In *Donnell*, we saw no conflict with *Landreth*, noting that the Tax Court found that if production failed and the bank sued on Landreth's guaranty, Petroleum Investors, Ltd. was ultimately liable, through subrogation, to Landreth, 417 F.2d at 115. [In *Donnell*, the guaranty ran to Calm' Corporation, C's counterpart, as well as to the bank.] Here again, we see no conflict. To the contrary, as in *Landreth*, the party bearing the risk of nonproduction is chargeable with the income from production. See also Internal Revenue Cumulative Bulletin, 1969–1, Rev.Rul. 69–262, in which the Internal Revenue Service recognizes the same factual distinctions in reconciling its decisions in *Landreth* and Estate of H. W. Donnell, 1967, 48 T.C. 552 (then on appeal and later affirmed by this Court).