DALE L. GARDNER AND EMMA J. GARDNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Gardner v. Commissioner
Docket No. 4603-73
United States Tax Court
T.C. Memo 1976-337; 1976 Tax Ct. Memo LEXIS 66; 35 T.C.M. (CCH) 1546; T.C.M. (RIA) 760337; 55 Oil & Gas Rep. 395; November 9, 1976, Filed *66 Petitioner entered into an oil and gas drilling program under which he agreed to pay $13,500 to Drilling Co. for drilling a well on a location assigned to him under a lease held by Transmission Co., an affiliate of the drilling company.At the time of entering into two such contracts in 1968 and two in 1969, petitioner made a cash downpayment of $2,700 and purportedly borrowed $10,800 from Leasing Co., a parent of Transmission Co., to pay Drilling Co. the balance due on the drilling contract. There is no evidence that wells were drilled or reworked on the specific locations assigned to petitioner. Drilling Co., Leasing Co., and Transmission Co. all became bankrupt in 1970. In 1970, following an audit of petitioner's books and records and his 1968 federal income tax return, petitioner received a letter from respondent stating his return for 1968 would be accepted as filed. In 1971, his 1968 return was reexamined and a notice of deficiency issued. Held, (1) petitioner is not entitled to deductions for intangible drilling and development costs in 1968 and 1969. Petitioner has not materially distinguished his case from the previous two reported decisions. See Lloyd L. Cottingham,63 T.C. 695 (1975); *67 Donald L. Heberer,T.C. Memo. 1974-139; and (2) reexamination of petitioner's 1968 return did not constitute an inspection of taxpayer's books of account within the meaning of sec. 7605(b) so as to require written notice of such reopening. Dale L. Gardner, pro se. George W. McDonald, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' federal income taxes for the calendar years 1968 and 1969 in the amounts of $8,546 and $697, respectively. Due to concessions by petitioners, the issues remaining for decision are as follows: (1) Whether petitioners are entitled to deductions claimed on their 1968 return for intangible drilling and development costs for oil wells. [1]
*69 (2) Whether respondent's reopening of petitioners' 1968 taxable year, after having sent a letter to petitioners stating that their return for 1968 had been accepted as filed, was improper. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [2] The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Dale L. Gardner and Emma J. Gardner, husband and wife, resided in San Diego, California at the time the petition herein was filed. Their joint federal income tax returns for the taxable years 1968 and 1969 were filed with the Internal Revenue Service Center, Ogden, Utah. Emma J. Gardner is a party to this action only because she joined in the filing of these returns and, accordingly, Dale L. Gardner will hereinafter be referred to as petitioner. In 1968 petitioner entered into a series of transactions hereinafter *70 referred to as the "drilling" or "Pelco" program. The drilling program was conducted by three corporations, Petroleum Equipment Leasing Co. (Leasing), Oil Field Drilling Co. (Drilling), and Gas Transmission Organization, Inc. (Transmission). Fred G. Luke, the president and chief executive of each corporation, was the sole shareholder of Leasing and Drilling. Transmission was a wholly owned subsidiary of Leasing. All three companies had their principal offices in Tulsa, Oklahoma, during the period in question.
Under the drilling program Leasing or Transmission acquired working mineral interests or rights in various properties.Each investor in the program would execute a "turnkey" contract with Drilling for the drilling of an oil or gas well at a particular location on these properties. The contracts were identical in all material respects, save the investor's name, the date, and the well location. Under the contract, Drilling agreed to drill an oil or gas well to a specified depth unless oil or gas was reached sooner. Drilling agreed to complete the well if, in the investor's opinion, "after the drilling and testing * * * [the well would] in all probability be productive of *71 oil and/or gas in paying quantities." The full contract price was normally $13,500, payable in a cash downpayment of $2,700 at the time of execution of the drilling contract and a balance payment of $10,800 upon completion of the well. In the instant case, at the same time as his initial payment of $5,400, petitioner executed two promissory notes payable to Leasing in the amount of $10,800 each. [3] The $10,800 notes provided for monthly payments of $488.47 at 8 percent annual interest, payable over a 2-year period. The notes bore no restrictive endorsements. Upon execution of the notes, petitioner signed a lease with Leasing for certain equipment purportedly related to the operation of the well at a monthly rental of $156 for 5 years.Simultaneously, petitioner entered into an agreement for the sale of oil or gas to Transmission. For oil, petitioner executed a division order, ostensibly as the owner of the specified well, and Transmission executed a 5-year "take-or-pay" contract under which, for a $13,500 well, it agreed to pay for a minimum of 450 barrels of oil a month during each of the first 2 years and a minimum *72 of 150 barrels for each of the last 3 years at $2.00 per barrel, whether it actually received such quantities or not. For gas, Transmission agreed to purchase an equivalent amount of product on similar terms, 9", 7" and 5" per 1,000 cubic feet, with the petitioner receiving payments in the same amounts he would have if he had purchased an oil well. The petitioner was to receive 75 percent of such payments attributable to his purported working interest. When petitioner signed the note, lease and contract, he received two checks along with a signature card and other documents for the purpose of opening an account in his name in the National Bank of Commerce, Tulsa, Oklahoma. One check, for $21,650, was drawn by Leasing payable to petitioner. The other, for $21,600, was signed by petitioner, drawn on his new account in the National Bank of Commerce, and was payable to Drilling. Petitioner signed the check payable to Drilling to cover the cost of completing his well and deposited the check from Leasing in his new account. He was also asked to complete a financial statement at that time. Payments made by Transmission under the purchase contract were deposited in petitioner's new *73 account after crediting the amounts due Leasing under the note and lease. [4]
In the early part of 1969 Pelco advised petitioner, both orally and in writing, that his wells were drilled and that they should produce sufficient quantity to provide for such minimum net cash return.
The two drilling locations assigned to petitioner, under his 1968 contracts, were located in Garfield County, Colorado. Such locations were designated on Pelco's books as (1) Garfield County, Colorado, Range 93W, Twp 6S, Sec.30, SW/4, and (2) Garfield County, Colorado, Range 93W, Twp 6S, Sec.30, NW/4. All Pelco's drilling in Colorado occurred in the latter part of 1969. The parties stipulated in Lloyd L. Cottingham,63 T.C. 695 (1975), *74 that the location of the well drilled in Garfield County, Colorado, was SW/4, NE/4 of Section 28, Twp 6S, Range 94W. Prior to petitioner's investment in the drilling program, 46 drilling sites in Garfield County, Colorado were assigned to 30 investors per Pelco's books and records. With the exception of petitioner and Takeda Brothers, the records show all such investors are assigned to either (1) locations within Range 94W, Garfield County, Colorado or (2) general locations designated as Garfield County, Colorado. Takeda Brothers, on November 15, 1968, was assigned drilling location SE/4 of SW/4, Section 30, Twp 6S, Range 93W, Garfield County, Colorado. It was Fred Luke's intention throughout the existence of the Pelco program that each investor receive formal title to each well for which he had signed a contract. However the program started with only three or four administrative employees and within a period of several weeks to several months they had to deal with several hundred investors' contracts. As a result, Luke's intentions never came to fruition; his companies were not able to cope with the necessary paperwork. But for possibly a few exceptions at the program's *75 outset specific wells were not assigned to specific investors, and letters of notification that oil had been reached at a specific site were mailed to investors as a matter of course without basis in fact or even reference to a particular existing well. [5]
After investigation by the Securities and Exchange Commission, in or about March 1970, Leasing, Drilling, and Transmission executed a consent order agreeing to discontinue further sale of securities, namely investment contracts in the drilling program. In March 1970, the three companies petitioned for corporate reorganization under Chapter X of the Bankruptcy Act and since have gone into liquidation as bankrupts. During the years in which the three companies were in operation, many of the leases and notes executed by investors after notification of purported oil or gas discovery were sold or discounted to lending institutions, equipment suppliers, drilling contractors and the like, including the leases and notes executed by petitioner. After such a discount or sale, Transmission would normally *76 pay the new holder the amount due on the note or lease and remit the balance of the guaranteed monthly payment to the investor's account at the National Bank of Commerce. This practice ended after Drilling, Leasing, and Transmission commenced bankruptcy proceedings, and thereafter many (if not all) of the new holders demanded that the investors, including petitioner, make payments under the notes and leases. In some cases, the new holders brought civil actions against investors to compel payment; in other cases, investors sued for injunctive relief. Some of these cases have been tried and some disposed of by settlement. In February of 1970, during an audit of petitioner's 1967 income tax return by an internal revenue agent, petitioner requested an audit of his 1968 return. The revenue agent obliged and, after examination of petitioner's books and records and income tax return for the year 1968, recommended "no change." The district director of internal revenue accepted the revenue agent's report and confirmed his findings by letter dated April 7, 1970. On March 10, 1971 a memorandum was forwarded to internal revenue service field audit groups from the chief of audit wherein *77 it was directed that certain uniform action be taken with regard to oil and well sales by Drilling. In complying with this memorandum, petitioner's 1968 taxable year was reopened without the issuance, and receipt by petitioner, of a reopening letter. Upon reexamination of his 1968 return, petitioner formally protested to the revenue agent the reopening of the 1968 taxable year without his receipt of a reopening letter from the district director. The only document of petitioner's reexamined was his federal income tax return for the taxable year 1968. In his notice of deficiency, dated March 15, 1973, respondent disallowed $27,000 of intangible drilling costs deducted by petitioner on his 1968 return. Respondent's explanation of the adjustment was as follows: It is determined that you have not established that the contract or contracts entered into between you and Oil Field Drilling Co. and its affiliated entities in the year 1968 * * * caused you to acquire or hold a working or operating interest in any tract or parcel of land; that any oil or gas well drilling activities were ever undertaken on your behalf as a result of said contract or contracts with respect to any specific *78 tract or parcel of land; and that you actually paid intangible drilling costs aggregating $27,000 in 1968 * * *. OPINION Other investors in this very same oil and gas drilling program have previously litigated the deductibility of intangible drilling and development costs purportedly incurred by them as a result of their investments therein. [6] In each instance we have upheld respondent's disallowance of deductions for such costs. Unless petitioner can materially distinguish his case from the previous two reported decisions, we must again sustain respondent's position. We find that the evidence adduced in this case supports no different a conclusion than we reached in the past. Reference is made to our opinion in the aforenoted cases for a more detailed discussion of our reasons for concluding as we do here. The statutory authority enabling taxpayers to elect to claim deductions for intangible drilling and development costs on their federal income tax return is contained in section 263(c), I.R.C. 1954, which provides: (c) * *79 * * Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. Section 1.612-4(a), Income Tax Regs., Promulgated pursuant to the above authority, provides, in part: (a) Option with Respect to Intangible Drilling and Development Costs. In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the *80 production of oil or gas * * * [including] the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts. * * * Respondent argues, and has argued in each previous Pelco program case, that (1) petitioner did not acquire any working or operating interests in any specific oil or gas properties; (2) petitioner did not place any sums at risk of non-production because he was looking to the credit of the three selling corporations as a group for the return of his investments rather than to the extraction of minerals; and (3) even assuming that petitioner did own working or operating interests in oil or gas properties, his deductions must be limited to the amount of his cash downpayments because (a) it has not been established that any wells were actually completed on his behalf for the year at bar and (b) the three selling corporations are to be considered as a single entity so that the financing arrangements amounted to mere nondeductible promises to pay and did not give rise to actual independent payments by petitioner to Drilling. Petitioner's position is that (1) he in good faith and only after *81 extensive investigation of the Pelco program, invested in this operation and should not be held responsible for fraudulent actions of another with whom he has contracted; (2) specific drilling locations were assigned to him and actually completed on his behalf; (3) the turnkey price of $27,000 (for two wells) was paid in 1968, prior to his notification of success of the drilling operation and therefore the total sum was at risk; and (4) he acquired a working or operating interest in two specific gas wells in Garfield County, Colorado. [7]
As in Donald L. Heberer,T.C. Memo. 1974-139 and Cottingham, the record does not support a finding that petitioner acquired a working or operating interest in individual wells. We are unable to link petitioner with specific contracts and with specific wells and drilling operations. See Commissioner v. Estate of Donnell,417 F. 2d 106, 111 (5th Cir. 1969); Commissioner v. Southwest Exploration Co.,350 U.S. 308, 314 (1956). *82 The record is clear that Luke intended throughout the program that each investor be assigned a specific well for each contract signed. [8] We have no doubt that petitioner believed he was risking $27,000 on the successful drilling, completion of, and production from a specific well. However, Luke testified in Cottingham that, but for a few possible exceptions at the program's outset, specific wells were not assigned to specific investors. Petitioner keys on this testimony and argues that he fits within this initial start-up class of investors. However, we have found that in Garfield County, Colorado, 46 wells were assigned to 30 investors prior to petitioner's entry into the program. *83 Moreover, petitioner introduced at trial photographs purporting to evince that wells were drilled on property assigned to him in Garfield County, Colorado. In fact, one of the photographs is a picture of a standpipe with markings SE/4, SW/ 4 Sec 30, Garfield County, Colorado. Unfortunately the range number is illegible. Drilling's books of record show that this site was purportedly assigned to Takeda Brothers on November 15, 1968, or almost 1-1/2 months prior to petitioner's assignment of, if it is in fact, Range 93. However, if this standpipe caps a well on Range 94, such evidence is equally unavailing because petitioner's purported assignments were on Range 93. Furthermore, petitioner has not introduced evidence establishing the dates his alleged pictured wells were drilled.Petitioner took his pictures in 1972. The record indicates that in Garfield County, Colorado, no wells were drilled in 1968 by Drilling and that in the latter part of 1969 Drilling drilled one or more wells on Range 94, Garfield County. Thus, without evidence as to when a well was actually completed, petitioner's claimed deductions for intangible drilling and development costs on Range *84 93 cannot be allowed. Erwin H. Haass,55 T.C. 43, 50 (1970); Heberer,supra;Cottingham,supra.
We turn next to petitioner's contention that respondent's reexamination of his 1968 federal income tax return, after having sent petitioner a "no change letter", was improper. Petitioner maintains that written notice of the reopening was not afforded him and therefore respondent's statutory notice of deficiency is invalid.
Petitioner relies upon section 7605(b) which provides: (b) Restrictions on Examination of Taxpayer.--No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary. Neither the facts nor the law support petitioner's contention. We have found that respondent's initial audit of petitioner's 1968 return included an examination of petitioner's books and records including a thorough review of the Pelco transactions. Upon reopening, the only document *85 of petitioner's examined was his 1968 return. "A review of the Form 1040, and accompanying schedules, does not constitute an inspection of a taxpayer's 'books of account.'" Blanche S. Benjamin,66 T.C. 1084 (1976), citing Guerkink v. United States,354 F. 2d 629 (7th Cir. 1965).An examination of Pelco's books of account (a third party's books) does not constitute an inspection of petitioner's books. DeMasters v. Arend,313 F. 2d 79 (9th Cir. 1963).Therefore, the reexamination of petitioner's 1968 return was not a second examination of his books of account within the meaning of section 7605(b) and does not require written notice be given petitioner by respondent. Moreover, we note our recent discussion in Blanche S. Benjamin,supra at 1098 of the purpose behind section 7605(b).
Section 7605(b) was enacted to prevent abusive and unnecessary inspections of a taxpayer's books and records by the tax collector.See United States v. Powell, 379 U.S. 48 (1964). The section was not designed to prevent the tax collector from diligently exercising his statutory duty of collecting the revenues. In this regard, the *86 Court of Appeals for the Ninth Circuit has stated: These grants of power [sections 7601 and 7602] are to be liberally construed in recognition of the vital public purposes which they serve; the exception stated in section 7605(b) is not to be read so broadly as to defeat them. A limited construction of section 7605(b) is also supported by the law's general antipathy to the erection of barriers to ascertainment of truth, and the policy against judicial intervention in the investigative stage of tax matters because of the danger of undue delay in the collection of the revenues. [Footnotes omitted.] [DeMasters v. Arend,supra at 87.] Furthermore, the record indicates that permission for such reopening was obtained in strict accordance with respondent's internal administrative procedures promulgated by Rev. Proc. 68-28, 1968-2 C.B. 912. [9]
The record is clear that, prior to entry into the Pelco program, petitioner made a diligent effort to ascertain the financial soundness of his investment. *87 He testified that he carefully structured the transaction to comply with the applicable tax laws. We do not doubt petitioner's good faith reliance upon the principals of the Pelco program to perform under the executed contracts and agreements. Although we are sympathetic with petitioner's dilemma the law is well settled that tax deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934).Petitioner, when pointing to section 263(c) to justify his deductions, must establish he falls within its terms. E. Jan Roberts,62 T.C. 834, 836 (1974). Here, petitioner has simply not met his burden of proof. Welch v. Helvering,290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure.
Decision will be entered for the Respondent. Footnotes
1. At trial petitioners conceded the deficiency and the adjustments relating to their oil/gas interests for 1969. Petitioners have presented no evidence at trial or argued on brief the issue, raised by their pleadings, of respondent's disallowance, in part, of their 1969 "office in home" expense. We deem this a concession by petitioners of this issue. In any event, we find that petitioners have failed to carry their burden of proving that respondent's determination was in error. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩
2. The parties have agreed that the entire record of trial in Lloyd L. Cottingham,63 T.C. 695 (1975), is to be part of the record in this case. Therefore, in our findings of fact, the relevant facts found in Cottingham↩ will be cited verbatim.
3. Petitioner purchased two contracts on December 24, 1968.↩
4. Net monthly payments to petitioner under the arrangements were to be a minimum of $30.53 for the first 2 years of the "take or pay" and lease contracts (450 barrels @ $2 = $900 X.75 = $675-($488.47 + $156) = $30.53) and $69 (150 barrels @ $2 = $300 X.75 = $225- $156 = $69) for the last 3 years. The minimum cash deposits in the investor's account under this schedule would equal approximately the $2,700 downpayment with interest over a 5-year period.↩
5. Petitioner testified that he could not recall whether his "gusher" letter differed from the standard form gusher letter.↩
6. Donald L. Heberer,T.C. Memo. 1974-139; Lloyd L. Cottingham,63 T.C. 695↩ (1975).
7. Petitioner advances additional arguments in an attempt to distinguish his case from Heberer and Cottingham.↩ In light of our result here, presentation of these positions is superfluous.
8. Luke's testimony in Cottingham connotes Pelco's problems with such assignments as follows: THE COURT: Well, then how did you make an assignment to say, 1,000 contracts--on 1,000 contracts when you only had 300 wells?
FRED LUKE: Well, but we had locations, and we had other wells, for example--in Colorado, there were 27 holes in the ground that we had intended to go in and put back on production.We drilled one well; our engineers said "It's not commercial." I was told by the people who I acquired it from, "You made a mistake. You didn't go far enough," and so we were doing further engineering study. It may well have been that we should have stayed there and did additional research. THE COURT: By that time you had, say, assigned 30 wells from this--under this lease" FRED LUKE: More than that, I'm sure. So we had to make a decision to reassign them to other locations or to go do further work on that area, but we ceased production before we made that decision.↩
9. Superseded by Rev. Proc. 72-40, 1972-2 C.B. 819; which was in turn superseded by Rev. Proc. 74-5, 1974-1 C.B. 416↩.