DONALD L. HEBERER AND NORMA A. HEBERER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heberer v. Commissioner
Docket No. 8997-72.
United States Tax Court
T.C. Memo 1974-139; 1974 Tax Ct. Memo LEXIS 180; 33 T.C.M. (CCH) 626; T.C.M. (RIA) 74139; 48 Oil & Gas Rep. 403; May 30, 1974, Filed. *180 Petitioner, Donald Heberer, entered into an oil and gas drilling program under which he agreed to pay $13,500 to Drilling Co. for drilling a well on a location assigned to him under a lease held by Transmission Co., an affiliate of the drilling company. Petitioner paid $2,700 in cash in 1969 and purportedly borrowed $10,800 from Leasing Co., parent of Transmission Co., to pay to Drilling Co. Payments on the note were to begin in January of 1970 and were to be paid from amounts Transmission agreed to pay petitioner for oil recovered from his well, whether Transmission actually took the oil or not. There is no evidence that a well was ever drilled on petitioner's assigned location, and Drilling Co., Leasing Co., and Transmission Co. all became bankrupt in 1970. Held: Petitioners have not carried their burden of proving that they are entitled to a deduction for intangible drilling and development costs in 1969. Donald L. Heberer, pro se. Richard H. Gannon, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1969 in the amount of $4,605.13. Petitioners did not put in issue an adjustment of their claimed deduction for contributions so the only issue for decision is whether petitioners may deduct the sum of $13,500, or any part thereof, as intangible drilling and development costs. FINDINGS OF FACT Petitioners were husband and wife residing in Torrance, Cal., at the time they filed their petition herein. They filed a joint individual income tax return for the year 1969 *182 on the cash basis of accounting. The notice of deficiency was issued by the internal revenue service office in Los Angeles, Cal. Donald Heberer will hereinafter be referred to as petitioner. Petitioner was a computer salesman working for Control Data Corporation in 1968 and 1969. His compensation was in part commissions on sales made, and he was successful in his selling efforts during these years. In 1968 petitioner learned from an individual whom he trusted about an oil and gas drilling program that could provide a tax shelter for some of his income with little risk to his investment. Petitioner contacted the people who were selling the program in 1968 but did not become involved at that time. In about July of 1969 petitioner again contacted an individual, Alvin Bawks, who was selling the drilling program. Petitioner became convinced that the program provided a good tax shelter with little risk and decided to invest in the program. Bawks sent petitioner information about how the program operated, which will be described below. On September 8, 1969, petitioner executed a drilling contract which was the first step in his participation in the program. The drilling program *183 was sponsored by Fred G. Luke of Tulsa, Okla. Three corporations were used in the plan. Petroleum Equipment Leasing Co. (hereinafter Leasing), was formed in 1960 or 1961 and commenced operations in 1966. Oil Field Drilling Co. of Oklahoma (hereinafter Drilling), and Gas Transmission Organization, Inc. (hereinafter Transmission), were formed in 1968. Luke owned all of the stock of Leasing and Drilling, and Leasing owned all of the stock of Transmission. Luke was president of all three corporations which all had offices in the same location in Tulsa. Under the drilling program, Leasing or Transmission [1] obtained subleases or working interests in oil and gas properties for the purpose of either drilling shallow wells or reworking wells on the property. These mineral interests were subject to a 25-percent royalty payable to the fee owner and/or the prior lessee. The area covered by the mineral interest was divided into smaller tracts. A prospective investor in the program would be asked to execute a drilling contract for a particular location. The drilling contract was a "turnkey" contract under which the contractor, Drilling, for a fixed fee of usually $13,500 (some were *184 for $15,000), agreed to drill a well on the assigned location to a specified depth unless oil or gas was encountered at a shallower depth, the well to be commenced within 30 days after the contract was signed. The "owner"-investor made a down payment of $2,700 at the time the contract was entered into. The contract and the down payment were sent to the Tulsa offices and the $2,700 was commingled with Drilling's general operating funds; it was not necessarily applied to the cost of drilling the investor's well. The average drilling time for one of these wells was 10 days. Upon being notified by Drilling that oil or gas in paying quantities had been encountered in his well, the investor was called upon to pay the balance of the contract price, or $10,800, and to execute certain additional documents. Leasing would loan the investor the additional money for which the investor would execute an installment *185 note in the face amount of $10,800, payable to Leasing with interest at 8 percent. The note was payable at the rate of $488.47 per month until paid in full, which was over a 2-year period. The investor also entered into an Equipment Leasing Agreement with Leasing to lease equipment used in completing and operating the well, as listed on an attachment, for a period of 60 months, for a rental of $156 per month. Simultaneously, the investor, as owner, also executed a Division Order (in the case of oil) to Transmission in which the investor certified that he was the legal owner of the specified well on the specified lease location, including the oil produced therefrom, and that Transmission should credit to the investor 75 percent of the oil produced and received therefrom. The investor also authorized Transmission to use the payments for the oil received to pay the monthly payments due on the investor's note and equipment leasing agreement. Transmission in turn signed a document agreeing to pay the investor $2 per barrel for each barrel of oil delivered and accepted by Transmission, and Transmission also agreed to "receive and purchase or pay for, if not taken" 450 barrels per month *186 of oil during the first 2 years of the agreement and 150 barrels of oil per month during the next 3 years of the agreement. Under the above arrangements the investor was entitled to receive from Transmission in payment for oil taken or not taken a minimum monthly payment of $675 (75 percent of $2 X 450 barrels) during the first 2 years of the agreement, and $225 (75 percent of $2 X 150 barrels) during the next 3 years. The $675 was to be applied $488.47 on the note and $156 on the lease, leaving a balance of $30.53 which was to be deposited in an account established for the investor in a bank in Tulsa. After the note was paid off in 2 years, the reduced payments would more than cover the lease payments for the remaining 3 years of the lease agreement. The cash deposited in the investor's account would total approximately $2,700 downpayment with interest over a 5-year period. Transmission was to keep the investor advised of the amount of oil received from the investor's well and the disposition of the price paid therefor by monthly oil and gas statements mailed to the investor. If the well drilled on the investor's assigned location was dry, the investor would usually be assigned *187 a new location at no extra cost. It was intended that Leasing would made a profit on the equipment lease; Drilling would make a profit under the turnkey drilling contract (the average cost of drilling these wells was $6,000 to $7,000), unless the first well was dry; Transmission would make a profit by selling the oil for more than it paid for it. The investor might realize a profit if his well produced a good amount of oil; and it was intended that he would save taxes on the deduction of intangible drilling costs (estimated to be $6,750 for a 70-percent taxpayer, after deducting the $2,700 cash investment). At the start of the program most of the paperwork was done at the offices of the companies in Tulsa under Luke's directions. However, by July 1969 the selling program had been so successful that the Tulsa office could not keep up with the paperwork; neither could Drilling keep up with the drilling program. Luke directed Bawks and his sales force to slow down on sales, and he also transferred the paperwork on sales made by Bawks' sales force to Bawks' office. Thereafter Bawks sent the notifications and supplemental documents to investors and reported on progress to them, *188 all based on information received by mail or telephone from Luke. The information transmitted to the investors was not factual, particularly in the latter part of 1969. When the investor was notified that oil in paying quantities had been encountered in his well and he was asked to execute the additional documents and pay the balance of $10,800, the drilling of a well on the investor's assigned location might not have even started. During the 2-year period the drilling program was in operation approximately 1,000 contracts were sold to approximately 600 investors, but only approximately 300 wells were actually drilled. Also, the monthly oil and gas statements sent by Transmission to the investors did not reflect actual facts. Transmission may have received no oil from the investor's well, nevertheless the investor was advised that enough oil and had been received and paid for to cover the monthly payments for which the investor was obligated as described above. Some of the notes given by investors were discounted at banks, but many of them were retained by Leasing. There was a large amount of intercompany borrowing of funds between the three corporations. In addition, the list *189 of equipment attached to the equipment lease agreement may not have been in existence; it was simply a list of typical equipment that would normally be used in completing and operating a well. [2]
On December 5, 1968, and on July 17, 1969, Luke wrote similar letters to Wien & Sales, an accounting firm in Beverly Hills, Cal., in which reference was made to the wells being drilled for them and the note for $10,800 given to Drilling for each well, which advised them that in the event any well drilled is dry, the note will be void, and there would be no further obligation to Drilling or any other entity in connection with the transaction; and that after the initial investment of $2,700 at no time would the investors' monthly out-of-pocket expenses or obligations exceed their income from their wells. The letters also advised that the above would *190 apply to any of the addressee's clients. Such advice was not given routinely to all investors, and petitioner was not so advised. As mentioned above, petitioner first signed a drilling contract on September 8, 1969. He was assigned a location on a lease located in Christian County, Ky. The contract was a typical drilling contract as described above, the turnkey price being $13,500 and the downpayment being $2,700 which petitioner agreed to pay by November 1, 1969. By letter dated November 13, 1969, from Drilling, signed by Bawks, petitioner was advised that Drilling had encountered geological problems in the area assigned for drilling petitioner's well in Kentucky and that the well could not be completed in 1969. For that reason Bawks suggested that petitioner be assigned a new location in Oklahoma. Petitioner was asked to note his approval by signing the letter, which he did. As a result, a new front page was substituted in petitioner's drilling contract assigning him a location for an oil well in Comanche County, Okla.
By letter dated November 19 or 24, [3] 1969, from Drilling, signed by Bawks petitioner was advised that his well located in Comanche County, which was *191 drilled and completed on November 20, 1969, encountered an oil-producing sand; that the well should produce to petitioner's working interest in excess of $700 per month; that the well was being connected to the pipeline and should be delivering oil during January of 1970, and that Transmission would send petitioner an oil statement each month of the oil produced and purchased by it. Petitioner signed and returned to Bawks a typical note and equipment leasing agreement both dated November 17, 1969. The note was payable to Leasing in the face amount of $10,800 with 8-percent interest from December 25, 1969, payable in installments of $488.47 on the 25th day of each month beginning January 25, 1970. The leasing agreement was for a term of 60 months, commencing January 25, 1970, for a total rental of $9,360, payable $156 per month commencing January 25, 1970. Petitioner also executed a Division Order to Transmission directing Transmission to credit petitioner with 75 percent for all oil received from his well, and by letter dated November 17, 1969, authorized Transmission to charge his account No. 2211-1 each month for the sums necessary to make the payments on his note and equipment *192 lease being held by Transmission for collection. In turn petitioner received a "take or pay" agreement from Transmission whereby Transmission agreed to receive and purchase from petitioner or pay for at the rate of $2 per barrel, 450 barrels of oil each month for 2 years and 150 barrels each month for the next 3 years. A check from Leasing dated November 19, 1969, payable to petitioner in the amount of $10,825 [sic] was deposited to an account opened in petitioner's name in the National Bank of Commerce in Tulsa and on the same day petitioner drew a check on this account in the amount of $10,800 payable to Drilling. By letter dated December 16, 1969, from Pelco Leasing Co. (Bawks' company) petitioner received copies of the note, equipment lease, and the checks issued in connection with his well No. 2211-1, and was advised that this completed all of the necessary steps for his "1969 write-off." In January of 1970, petitioner received an "oil and gas statement" from Transmission advising that 450 barrels of oil *193 had been received from well No. 2211-1 and had been paid for at the rate of $2 per barrel, or a total of $900. Petitioner's interest, totaling $675 (75 percent), was paid by crediting $488.47 on his note, $156 on his lease payment, with the balance of $30.53 being deposited in his account at the bank in Tulsa. Apparently this was the only such statement received by petitioner. Under date of March 3, 1970, Transmission sent a "Memorandum To Purchasers," a copy of which petitioner received, advising that the Securities and Exchange Commission was investigating the three companies to determine whether they were violating the securities laws. The memorandum also advised that the monthly cash payments of $30.53 would be discontinued although the payments on the notes and equipment leases would continue to be taken care of by Transmission pursuant to the "take or pay" contracts, explaining that the company had experienced a backlog in drilling and producing and because some purchasers had executed notes prior to the time their wells were drilled the presently producing wells had not reached the amounts of oil and gas necessary to meet current payments due on notes and leases and overrides *194 to prior owners. It went on to explain that the figures used in prior oil and gas statements issued to investors had been ficticious, being arbitrarily established by the company in amounts that would meet the investor's obligations on notes and leases with $30.53 left for deposit to the investor's accounts. Advising that this practice was being discontinued, the investors were told that Transmission would not in the future credit the investor's accounts with any amounts not actually owed on actual production from their wells. The three companies apparently entered into a consent decree with the SEC agreeing not to sell any more securities. Leasing, Drilling and Transmission all filed petitions in bankruptcy on March 23, 1970. The bankruptcy proceeding was still pending at the time of the trial of this case, December 11, 1973. All of the properties of all three companies were in the hands of the trustee in bankruptcy who was making an effort to liquidate them. Petitioner was notified of the bankruptcy proceedings but had not filed any proof of claim therein; also that the trustee in bankruptcy had made to him an offer to settle on petitioner's note for a payment of $750 *195 in cash and release "all claims to the lease." Petitioner thought it was a bad bargain and did not accept it. Petitioner has personally made no payments on the note or leasing agreement other than the amounts credited thereon by Transmission under the "take or pay" contract. On Schedule C of their 1969 income tax return petitioners reported no income from their business, described as oil well owner, but claimed a loss of $13,500 resulting from expenses, explained as follows: This expense was for the drilling of an oil well in 1969. Income scheduled to begin in 1970. This loss was offset against petitioner's income received from Control Data Corporation. In the notice of deficiency respondent disallowed the entire amount of the deduction claimed "because you have not established that you acquired or owned a working or operating interest in a specific oil and gas well or parcel of land or that drilling expenses of $13,500 were ever incurred on your behalf with respect to such a parcel of land." OPINION Section 263, I.R.C. 1954, provides as follows: Intangible Drilling and Development Costs in the Case of Oil and Gas Wells. - Notwithstanding subsection (a), regulations *196 shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress. Section 1.612-4(a), Income Tax Regs., which was promulgated pursuant to the above authority, provides, in part, as follows: (a) Option with respect to intangible drilling and development costs. In accordance with the provisions of section 263(c) intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas * * * [including] the cost *197 to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts. * * * Petitioner has not favored us with a written brief, so we are not certain what his legal arguments are, except what he stated in an oral argument at the conclusion of the trial to the effect that he owned a well and paid $13,500 to have the well drilled. [4]
Respondent contends (1) that petitioner did not acquire a working or operating interest in an oil or gas property because under the arrangement he looked to the selling corporations as a group for a return of his investment rather than to the extraction of minerals; (2) that amounts payable only upon the drilling and completion of a particular well are *198 not payable or deductible until the well has been completed, and even assuming that petitioner owned a working interest in a well during 1969, only $2,700 of the amount in question is deductible since it has not been established that petitioner's well was drilled and completed during 1969; and (3) that since all three of Luke's corporations were related to each other, the note given by petitioner to Leasing was a sham, and petitioner did not actually pay for drilling and development until payments were made on his obligations under the agreement, which was after the year 1969 in issue. We must find against petitioner on this issue because the record does not support the finding that any amounts paid by petitioner in 1969 were actually employed in drilling and developing a well on property in which petitioner had acquired a working or operating interest. Both petitioner and Bawks testified that they had not actually seen petitioner's well on location and that they did not know whether a well had been drilled on petitioner's location; petitioner testified that he simply relied on the "gusher letter" of November 19 or 24 as proof that a well had been drilled on his location. Luke *199 testified that only approximately 300 wells had been drilled under approximately 1,000 contracts and that he did not know whether a well had been drilled at petitioner's location. The law and regulation grant the option to charge as expense intangible drilling and development costs incurred by an operator in the development of oil and gas properties. An operator is defined as one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working and operating rights. Without going into the question of whether petitioner qualified technically as an operator, we interpret the regulation to mean that the election is available only with respect to those expenditures actually made for drilling and developing or completing a well on property in which the operator has a working or operating interest, i.e., an economic interest. The record in this case simply does not bring petitioner within the regulation as so interpreted. In Commissioner v. Estate of Donnell, 417 F.2d 106, 111 (C.A. 5, 1969), the court stated: It is clear that the operator eligible for the expense deduction *200 in Treasury Regulation § 1.612-4 is one who holds a working interest which under Treasury Regulation § 1.614-1(a) (2) and (3) is defined as an economic interest in a mineral deposit. It is therefore apparent that the intent of the regulation was to limit the expensing privilege to one holding the same sort of economic interest as that required for the depletion deduction. Furthermore, even if a well was actually drilled on the location in which petitioner might have had an economic interest, without evidence as to when such a well was actually completed, petitioner's claimed deduction for intangible drilling and development costs might also run afoul of this Court's opinion in Erwin H. Haass, 55 T.C. 43, 50 (1970). In that case this Court stated with respect to section 1.612-4 of the Regulations that: The regulations do not contemplate that investors in oil and gas wells drilled to production may be permitted to designate the costs of the interest in such wells as drilling and development expenses retroactively incurred, thereby being allowed a deduction for intangible drilling costs without assuming the risk *201 of the unknown result of the drilling. * * * In that case two of the wells involved had been completed prior to the time the taxpayer acquired an interest in the property. The Court concluded that with respect to those two wells the taxpayer simply bought an interest in completed wells. The record in this case does not establish, even if a well was drilled on petitioner's location, when that well was completed. The only evidence presented as to when such a well might have been completed was the "gusher letter" which admittedly was not factual. There is also a question whether the $10,800 petitioner purportedly paid to Drilling in November of 1969 can be considered an actual payment by petitioner for drilling and developing a well in 1969. Under the drilling contract petitioner was not required to pay the balance of the contract price until completion of the well. While petitioner purportedly borrowed $10,800 from Leasing and turned that amount over to Drilling in 1969, no payments were due on the note to Leasing until January 25, 1970, and the payments were purportedly guaranteed by Transmission, a wholly-owned subsidiary of Leasing. In fact, petitioner has not yet been called *202 upon to pay the note, 4 years after the Luke companies became bankrupt. Under such circumstances it can hardly be said that petitioner actually paid the $10,800 for drilling and development costs in 1969. The earliest date he was obligated to pay any amount out of his own pocket, in addition to the $2,700 downpayment, was January 25, 1970, if then. At that time the well was supposed to have been completed. See Erwin H. Haass, supra.
As testified by Luke, the drilling program was designed to permit him or his companies to drill wells with borrowed money, with the incentive of a tax deduction being offered to the lenders or investors to advance the money. The only amounts he ever intended to obtain from the investors was the $2,700 downpayment, and this was supposed to be returned to the investors, plus 8 percent interest, over a 5-year period. Even the $2,700 downpayment could be considered a loan guaranteed by Transmission, which was the owner of the leasehold interests. Petitioner has in all likelihood lost his $2,700, but it was because of the bankruptcy of the three corporations, not because it was spent for drilling a dry hole. We conclude that petitioner *203 is not entitled to a deduction for intangible drilling and development costs in 1969. [5]
Decision will be entered for the respondent. Footnotes
1. Luke testified that the mineral interests were actually held in the name of Transmission for the benefit of investors, but there was no documentation of this, and the investors were never given any document transferring an interest in a well or mineral interest to them. ↩
2. It is not clear from the record just what the equipment was supposed to be used for. However, because Drilling used its own drilling equipment to drill the wells and because the lease was not executed until after the well was drilled, we assume the attachment listed equipment that would normally be used to complete and operate a well. ↩
3. There is some uncertainty about the correct date but it is not material to the issue decided here. The note and other documents bore a date of November 17, 1969. ↩
4. Counsel for respondent advised the Court at the opening of the trial that this case was one of about 75 cases involving other investors in the same drilling program promoted by Luke, and that respondent would have preferred to have this case delayed until one of those cases, wherein the taxpayer had employed counsel, could be presented. However, petitioner herein preferred to proceed with the presentation of his own case. ↩
5. Our conclusion is limited to the facts established by the evidence in this case. We do not mean to imply that other investors in this drilling program are not entitled to deductions for intangible drilling and development expenses if there is proof that the circumstances were different. ↩