LLOYD L. COTTINGHAM AND NANCY M. COTTINGHAM, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5573–72, 6879–72, 807–73, 8700–73, 8864–73, 450–74.     Filed March 19, 1975.

---

[1] Proceedings of the following petitioners are consolidated herewith: James M. Benson and Cora Benson, docket No. 6879–72; Robert R. Kressin and Dorothy A. Kressin, docket No. 807–73; Ernest A. Doud and Catherine H. Doud, docket No. 8700–73; Charles F. Wright and Priscilla S. Wright, docket No. 8864–73; and Frank Pavel and Marilyn Pavel, docket No. 450–74.

*Stanley E. Jennings,* for the petitioners.
*Richard H. Gannon,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 5573–72 | Lloyd L. Cottingham and Nancy H. Cottingham ____ | 1969 | $12,421.92 |
| 6879–72 | James M. Benson and Cora Benson_____ | 1969 | 9,252.00 |
| 807–73 | Robert R. Kressin _____ | 1966 | 68.00 |
| | Dorothy A. Kressin _____ | 1966 | 69.00 |
| | Robert R. Kressin and Dorothy A. Kressin _____ | 1969 | 9,381.00 |
| 8700–73 | Ernest A. Doud and Catherine H. Doud _____ | 1968 | 32,523.46 |
| | | 1969 | 28,899.14 |
| 8864–73 | Charles F. Wright and Priscilla S. Wright _____ | 1968 | 6,295.01 |
| | | 1969 | 5,034.51 |
| 450–74 | Frank Pavel and Marilyn Pavel _____ | 1968 | 5,753.99 |
| | | 1969 | 35,179.49 |

The only issue for decision is whether petitioners are entitled to deductions claimed on their returns for 1968 and/or 1969 [2] for intangible drilling and development costs for oil wells.

FINDINGS OF FACT

Some facts have been stipulated and are so found.

Petitioners bearing the same surname were husband and wife at the time the returns in question were filed. At the time of filing of the petitions herein, all petitioners resided in the State of California. The female petitioners, with the exception of Dorothy A. Kressin for the year 1966, are before the Court because they filed joint returns with their husbands for the years at bar. Unless context indicates otherwise, the term "petitioners" shall be used to refer to the male petitioners.

These cases arise from the fact that during 1968 and 1969, each of the petitioners entered into a series of transactions hereinafter referred to as the "drilling" or "Pelco" program.

The drilling program was conducted by three corporations, Petroleum Equipment Leasing Co. (Leasing), Oil Field Drilling Co. (Drilling), and Gas Transmission Organization (Transmission). Fred G. Luke, the president and chief executive of each corporation, was the sole shareholder of Leasing and Drilling. Transmission was a wholly owned subsidiary of Leasing. All three companies were officed in Tulsa, Okla., during the period in question here.

Under the Drilling program, Leasing or Transmission acquired working mineral interests or rights in various properties. Each investor in the program would execute a "turnkey" contract with Drilling for the drilling of an oil or gas well at a particular location on these properties. The contracts were identical in all material respects, save the investor's name, the date, and the well location. Under the contract, Drilling agreed to drill an oil or gas well to a specified depth unless oil or gas were reached sooner. Drilling agreed to complete the well if, in the investor's opinion, "after the drilling and testing * * * [the well would] in all probability be productive of oil and/or gas in paying quantities." The full contract price was normally $13,500, payable in a cash downpayment of $2,700 at the time of execution of the drilling

---

[2] The deficiencies asserted against Robert R. and Dorothy A. Kressin for 1966 resulted from respondent's disallowance of net operating loss carrybacks from 1969 based on those petitioners' claimed deductions for intangible drilling and development costs in 1969.

contract and a balance payment of $10,800 upon completion of the well. Some contracts called for a downpayment of $3,000 and a total price of $15,000.

Later, an investor would be notified, usually by letter, that drilling at his wellsite had successfully reached oil. At some time thereafter, the investor would be asked to execute a document purporting to be a promissory note payable to Leasing in the amount of $10,800 in monthly installments of $488.47, at 8-percent annual interest, which was over a 2-year period. Occasionally investors would sign notes before drilling was to begin, with the understanding that the notes not be "activated" until oil was reached. Some notes, including one executed by petitioner Charles F. Wright, bore restrictive endorsements that the payee waived any payments required under the note to the extent they exceeded income received by the payor under the oil or gas sale contract described *infra.*

Upon execution of the note, the investor would also sign a lease from Leasing for certain equipment purportedly related to operation of the well at monthly rental of $156 for 5 years. Simultaneously, the investor would enter into an agreement for the sale of oil or gas to Transmission. For oil, the investor would execute a division order, ostensibly as the owner of the specified well, and Transmission would execute a 5-year "take or pay" contract under which, for a $13,500 well, it agreed to pay for a minimum of 450 barrels of oil per month during each of the first 2 years and a minimum of 150 barrels per month for each of the last 3 years at $2 per barrel whether it actually received such quantities or not. The investor was to receive the percentage of such payments specified in the division order, usually 75 percent.

When the investor signed the note, lease, and purchase contract, he received two checks along with signature cards and other documents for the purpose of opening an account in his name in the National Bank of Commerce in Tulsa, Okla. One check, normally for $10,825, was drawn by Leasing payable to the investor. The other, normally for $10,800, was to be signed by the investor, drawn on his new account in the National Bank of Commerce, payable to Drilling. The investor would sign the check payable to Drilling to cover the cost of completing his well and deposit the check from Leasing in his new account. He would also be asked to complete a financial statement.

Payments made by Transmission under the purchase contract were deposited in the investor's new account after crediting the amounts due Leasing under the note and lease. Net monthly payments to the investors under the arrangement were to be a minimum of $30.53 for the first 2 years of the "take or pay" and lease contracts (450 barrels @ $2 = $900 × .75 = $675–($488.47 + $156) = $30.53) and $69 (150 barrels @ $2 = $300 × .75 = $225–$156 = $69) for the last 3 years. The minimum cash deposits in the investor's account under this schedule would equal approximately the $2,700 downpayment with interest over a 5-year period.

During 1968, 1969, and 1970 approximately 1,050 drilling programs were sold to 472 investors. Only about 300 wells were in fact drilled, however.

It was Fred Luke's intention throughout the existence of the Pelco program that each investor receive formal title to each well for which he had signed a contract. However, the program started with only three or four administrative employees and within a period of several weeks to several months had several hundred investor's contracts to deal with. As a result, Luke's intentions never came to fruition: His companies were not able to cope with the necessary paperwork. But for possibly a few exceptions at the program's outset not involving any of the present petitioners, specific wells were not assigned to specific investors, and letters of notification that oil had been reached at a specific site were mailed to investors as a matter of course, without basis in fact or even reference to a particular existing well. The downpayments of $2,700 or $3,000 made by each investor went into the Pelco program companies' general cash fund and were used for payroll and operating costs and to make downpayments on and purchase properties and mineral leases.

Drilling operations actually conducted under the Pelco program were in Colorado, Kentucky, Louisiana, Ohio, Oklahoma, Texas, and West Virginia. Petitioners have introduced extensive testimony and exhibits to attempt to establish that drilling operations were actually conducted at specific wellsites assigned to petitioners.[3] The record indicates

---

[3] This evidence included: Testimony by E. James Moore, a geologist who performed various services for the Pelco program including supervision of drilling of several wells for the program in Oklahoma; logs prepared by Moore covering 19 wells drilled in Oklahoma; testimony of Edward Scott Luke, president of Oil Field Drilling of Texas which performed most of the program's drilling in Texas; reports filed by Edward Luke with the Railroad

that to each drilling contract signed by a petitioner a purported drilling location was affixed. However, with respect to all but one of the drilling contracts signed by petitioners, the drilling location assigned was very general—usually no more than the designation of a county and State or a portion of a section of a township in which drilling was to occur. The record does indicate that drilling operations did take place in or near the locations assigned to petitioners. However, the record contains no basis for attributing any individual well known to be drilled to any petitioner or contract.

The three companies, Leasing, Drilling, and Transmission, had four basic sources of cash: Investors' downpayments, substantial investments in Leasing by persons known as the "Hollywood group" in amounts not disclosed by the record, sale of oil and gas, and discount and/or sale of $10,800 and $12,000 notes executed by investors after receipt of the notification letters described *supra.*

Each of the three companies was intended to be profitable. Leasing was to profit by lending money to the investors at 8-percent interest and by leasing equipment to them at a higher rental than was paid by it for the equipment. Drilling was to drill wells at costs below the amounts charged to investors. Transmission was to sell gas and oil at prices higher than it paid to investors. The price paid to investors was low, to offset Transmission's minimum payment obligation under the take or pay contract.

After investigation by the Securities and Exchange Commission, in or about March 1970, Leasing, Drilling, and Transmission executed a consent order agreeing to discontinue further sale of securities, namely investment contracts in the drilling program. In March 1970, the three companies also petitioned voluntarily for corporate reorganization under chapter

Commission of Texas, Oil and Gas Division, covering wells drilled by Luke's company; testimony, taken by deposition, by William J. Crow, a geologist and engineer who supervised some drilling operations for the Pelco program in Oklahoma; a map of the St. Gabriel area of Iberville Parish, La., showing three wellsites drilled under Crow's supervision and a fourth scheduled to be drilled but apparently not completed; several reports and other documents, some submitted to the Oil and Gas Conservation Commission of the State of Colorado, covering drilling operations in Colorado, a letter to petitioners' counsel from the Oil-Law Records Corp. of Oklahoma City, Okla., reporting on eight Pelco program wellsites in Oklahoma; and reports submitted to the Oklahoma Corp. Commission, Oil and Gas Conservation Department, on six of the above sites.

X of the Bankruptcy Act and since have gone into liquidation as bankrupts.

During the years in which the three companies were in operation, many of the $10,800 and $12,000 notes executed by investors after purported notification of oil discovery, and many of the leases, were sold or discounted to lending institutions, equipment suppliers, drilling contractors, and the like. After such a discount or sale, Transmission would remit its monthly guaranteed payments directly to the new holder of the note or lease involved. This practice ended, however, after Drilling, Leasing, and Transmission commenced bankruptcy proceedings, and thereafter many (if not all) of the new holders demanded that the investors make payments under the notes and leases. In some cases, the new holders brought civil actions against investors to compel payment; in other cases, investors sued for injunctive relief. On June 5, 1970, a complaint for misrepresentation and declaratory and injunctive relief was filed in the Superior Court of the State of California for the County of San Diego, with five of the instant petitioners as plaintiffs and the remaining petitioner, Robert R. Kressin, named as a defendant along with Fred G. Luke, each of the bankrupt corporations, and others.

Of the civil actions filed by or against investors, some have been tried and disposed of by settlement. Of the cases tried, some have resulted in verdicts for, and some in verdicts against, investors. None of the verdicts had been reduced to judgment at the time of trial herein. Some of the notes and leases not sold or discounted, were purchased from the trustee in bankruptcy for $750, while others remain in the trustee's possession.

Receipts of the bankrupt corporations from oil and gas sales for the years 1967 through 1970 were as follows:

| | | | |
|---|---|---|---|
| 1967 | $1,118 | 1970 | $221,406 |
| 1968 | 5,890 | | |
| 1969 | 164,293 | Total | 392,707 |

The sum of investors' downpayments and proceeds from discount and/or sale of investors' notes were as follows:

| | | | |
|---|---|---|---|
| 1967 | 0 | 1970 | $3,655,750 |
| 1968 | 0 | | |
| 1969 | $1,489,125 | Total | 5,144,875 |

Of that total, $2,818,800 represented downpayments and $2,326,075 represented discount and/or sale proceeds. The record does not permit a more accurate breakdown of these figures. The companies had miscellaneous income as follows:

| | | | |
|---|---|---|---|
| 1967 | $111,557 | 1970 | ($71,030) |
| 1968 | 444,309 | | |
| 1969 | 1,018,611 | Total | 1,503,447 |

Drilling's drilling expenses and intangible development costs were as follows:

| | Colo. | Ky. | La. | Ohio | Okla. |
|---|---|---|---|---|---|
| As of: 7/31/69 | – – – | – – – | – – – | $186,302 | – – – |
| 8/1/69 to 1/1/70 | $14,952 | $13,720 | – – – | – – – | $1,250 |
| 1/1/70 to 4/1/70 | – – – | 6,359 | $12,654 | – – – | 22,797 |
| Totals | 14,952 | 20,079 | 12,654 | 186,302 | 24,047 |

| | Texas | W. Va. | Unallocated | Total |
|---|---|---|---|---|
| As of: 7/31/69 | $343,400 | – – – | $55,811 | $585,513 |
| 8/1/69 to 1/1/70 | 673,923 | $2,265 | 182,231 | 888,341 |
| 1/1/70 to 4/1/70 | 61,831 | – – – | 1,249,183 | · 1,352,824 |
| Totals | 1,079,154 | 2,265 | 1,487,225 | 2,826,278 |

Petitioner Lloyd L. Cottingham made cash downpayments of $2,700 on each of two wells on June 6, 1969. The same year, he executed two negotiable promissory notes, each in the amount of $10,800, for sums borrowed from Leasing to pay the balance of the $13,500 turnkey price per well. On his Federal income tax return for 1969, Cottingham claimed a deduction for intangible drilling costs of $27,000, the full amount of the cash paid and notes executed. Respondent disallowed the full deduction in 1969, but credited Cottingham with a loss deduction of $5,400, the amount of the petitioner's 1969 cash payments, in 1970, the year Leasing, Drilling, and Transmission filed for bankruptcy. One of Cottingham's $10,800 notes was negotiated by Leasing to Security Pacific National Bank, and Cottingham made payments in settlement of it in 1973.

Petitioner James M. Benson invested in two wells in 1969. Benson paid cash downpayments totaling $5,400 in June 1969. In or about October 1969 he executed two promissory notes of $10,800 each, for amounts borrowed from Leasing to pay Drilling the remainder of the turnkey price. On his Federal income tax return for 1969, Benson claimed a deduction of $27,000 for intangible drilling costs and reported royalty income from the Pelco program of $2,700. In his statutory notice of deficiency,

respondent disallowed $25,328 as improperly claimed intangible drilling costs. Respondent credited Benson with a loss deduction of $5,947 in 1970, the year the Pelco program ended in bankruptcy. The record contains no explanation for the variance between the amounts disallowed and allowed by respondent and the net deduction claimed by Benson and his cash investment in the Pelco program, respectively.

Petitioner Robert R. Kressin invested in seven wells in 1969. In addition, he was a partner in the North Shores Medical group which invested in four wells in 1969. Kressin claimed a portion of the partnership's loss on his 1969 tax return. Kressin was at that time an investment adviser to the petitioners Cottingham, Benson, Doud, and Pavel, and to others. Kressin was paid a commission or finder's fee for bringing in new investors in the drilling program. All of these payments were reported as income on Kressin's 1969 and 1970 Federal income tax returns. Most of them were applied toward his downpayments on six wells. The seventh downpayment was in cash. Kressin claimed a deduction of $94,500 for intangible drilling costs in the Pelco program on his 1969 Federal income tax return and $4,658 as a loss from the North Shores Medical group. In his statutory notice of deficiency, respondent disallowed $89,964 of the intangible drilling cost deduction and all of the partnership loss. Respondent credited Kressin with a deduction of $18,311 in 1970 as a loss incurred in connection with the bankruptcy of the Pelco program.

Petitioner Ernest A. Doud invested in 10 wells, 5 in 1968 and 5 in 1969. Doud made cash downpayments of $2,700 with respect to each well, but the downpayments on 3 wells in 1969, a total of $8,100, were reimbursed to him for efforts in informing others of, and referring them to, the Pelco program. Doud inadvertently did not report the reimbursed amounts as income on his 1969 Federal income tax return. Doud also executed negotiable $10,800 promissory notes with respect to each of the 10 wells. All of the promissory notes were executed in 1969. Doud was notified that one of the 1968 wells resulted in a dry hole. On his Federal income tax return for 1968, Doud deducted $67,500 as intangible drilling and development costs for the Pelco program. On his 1969 return, he deducted $67,500 for the same reason. In his notice of deficiency, respondent disallowed both deductions, but credited Doud with a deduction of $18,900, the amount of his

cash investment net of reimbursements, in 1970, the year of the Pelco program's bankruptcy.

Petitioner Charles F. Wright invested in one well in 1968 and one in 1969. For the 1968 well, Wright made a $3,000 cash downpayment on December 26, 1968, and paid the balance due by check dated December 23, 1968, drawn on the National Bank of Commerce in the amount of $12,000. He did not, however, execute a note to cover the purported loan from Leasing to cover the balance payment until August 1, 1969. For the 1969 well Wright signed the drilling contract on September 15, 1969, signed a note for the $10,800 postdiscovery downpayment on October 30, 1969, and made the $2,700 downpayment on December 5, 1969. The $10,800 note bore the restrictive notation that the payee waived any payments of interest and/or principal in excess of amounts received by Wright under the take or pay contract with Transmission. Wright deducted $15,000 on his 1968 Federal income tax return, and $13,500 on his 1969 Federal income tax return, as intangible drilling and development expenses. On his 1969 return, Wright reported $1,603.92 as net income from oil royalties. Respondent disallowed the $15,000 deduction in its entirety for 1968 and increased Wright's income for 1969 by $11,896.08, the amount of the deduction claimed less royalty income reported.

Petitioner Frank Pavel invested in six wells in 1969. He executed six $10,800 promissory notes and made six $2,700 cash downpayments in that year. Pavel claimed a deduction of $81,000 as oil well drilling expense on his 1969 Federal income tax return. Respondent disallowed the entire deduction in his statutory notice of deficiency.

OPINION

The oil- and gas-drilling program involved in these cases is the same drilling program involved in the case of *Donald L. Heberer* in which a Memorandum Opinion of this Court was filed May 30, 1974 (T.C. Memo. 1974–139), holding that Heberer was not entitled to deduct his investment in the program as intangible drilling expense. Although we received considerably more evidence in these cases, we cannot find that the facts gleaned from that evidence support a different conclusion in these cases. Reference is made to our opinion in that case for a more detailed discussion of our reasons for concluding as we do here.

Petitioners individually entered into a coordinated series of transactions purportedly designed to give them working and operating interests in oil and gas wells under "turnkey" contracts with Oil Field Drilling Co. (Drilling). Petitioners arranged for financing and wellsite equipment through Petroleum Equipment Leasing Co. (Leasing), and executed division orders and "take or pay" oil purchase contracts, which also acted as guarantees for the financing arrangements, with Gas Transmission Organization, Inc. (Transmission). Drilling and Leasing were owned by one Fred G. Luke, and Transmission was owned by Leasing, and all three corporations shared common offices in Tulsa, Okla. Petitioners elected to claim deductions for intangible drilling and development costs on their Federal income tax returns for the years at bar in the full amounts of their investments in the form of cash downpayments and financed secondary payments in the drilling program.

Section 263(c), I.R.C. 1954, provides:

(c) INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS.—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

Section 1.612-4(a),[4] Income Tax Regs., which was promulgated pursuant to the above authority, provides, in part:

(a) *Option with Respect to Intangible Drilling and Development Costs.* In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas * * * includ[ing] the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts. * * *

---

[4] For a concise history of the regulations granting the optional deduction of intangible drilling and development costs, see *Harper Oil Co. v. United States,* 425 F. 2d 1335, 1338–1340 (C.A. 10, 1970).

Respondent's position is that (1) petitioners did not acquire any working or operating interests in any specific oil or gas properties; (2) petitioners did not place any sums at risk of nonproduction because they were looking to the credit of the three selling corporations as a group for the return of their investments rather than to the extraction of minerals; (3) even assuming that petitioners did own working or operating interests in oil or gas properties, their deductions must be limited to the amounts of their cash downpayments because (a) it has not been established that any wells were actually completed on behalf of any petitioner for the years at bar and (b) the three selling corporations are to be considered as a single entity so that the financing arrangements amounted to mere nondeductible promises to pay and did not give rise to actual independent payments by petitioners to Drilling.

Petitioners argue (1) that they may have been misinformed as to well locations and other particulars of the drilling program, but that they nonetheless acquired working or operating interests in oil or gas properties either individually or as a group and (2) that the three corporations are not to be regarded as a single entity, so that the fact that petitioners borrowed from Leasing to pay Drilling does not affect their rights to deductions in the years claimed.

We find, first, that the record will not support a finding that petitioners acquired working or operating interests in individual wells. As we noted in *Heberer,* we interpret section 1.612–4(a) of the regulations, *supra,* to mean that the election under section 263(c) is available only respecting expenditures actually made for drilling and developing or completing a well on property in which the operator has a working or operating interest of the same sort as required for the depletion allowance deduction. See *Commissioner v. Estate of Donnell,* 417 F. 2d 106, 111 (C.A. 5, 1969); *Commissioner v. Southwest Exploration Co.,* 350 U.S. 308, 314 (1956).

It is clear that petitioners and Luke all intended that petitioners individually acquire such interests in extant wellsites and wells. Luke testified credibly that he intended throughout the program that each investor be assigned a specific well for each drilling contract signed. The drilling contracts and petitioners' testimony at trial indicate that petitioners certainly thought that they were risking their downpayments and, in most cases, their

balance payments on successful drilling and completion of, and production from, a specific well. None of these intentions were realized, however. Soon after the drilling program was started, it was swamped by investors' contracts, and Luke's small administrative staff was never able to assign wells actually drilled to individual contracts. Wendell Sugg, who performed accounting services for the three Pelco program corporations, testified that the companies' records generally offered no basis for attributing specific wells to specific investors or contracts. Three witnesses offered by petitioners, E. James Moore, Edward Scott Luke, and William J. Crow (who testified by deposition), had actually performed drilling operations for the Pelco program, Luke in Texas and Crow in Louisiana. Petitioners stipulated, however, that Luke could not personally tie any of the wells he was associated with to any individual contract or investor; nor have petitioners offered any basis for associating wells drilled by Moore, Luke, or Crow, with individual investors or contracts. Petitioners also introduced a variety of documentary evidence tending to establish the drilling of particular wells in the Pelco program. Here, too, however, petitioners have not suggested, nor has our own review of this evidence produced, an identification of such wells with individual investors in the program.[5]

Here, as in *Heberer,* absent evidence to link specific contracts and petitioners with specific wells and drilling operations, we cannot allow deduction of any intangible drilling and development costs.

Petitioners advance an argument not before us in *Heberer:* That they and the other investors in the Pelco program shared pooled interests in the drilling operations and properties involved and should be allowed the deductions at issue on that basis. There are several weaknesses in this argument, however. First, the

---

[5] The closest approach to direct evidence of drilling in locations assigned to petitioners appears to lie in Crow's deposed testimony and a map of Crow's drilling operations in the St. Gabriel area, Iberville Parish, La., submitted therewith. The record shows that one drilling contract was assigned to petitioner Kressin and two to petitioner Doud in the southeast quarter of the northeast quarter of sec. 18, township 95, range 2G, Iberville Parish, La. As nearly as we are able to determine from Crow's testimony and map, Crow drilled one well in the area designated above, in the north half of the northwest quarter of it. Only one of the three petitioners' contracts is purportedly assigned the northwest quarter of the area described above, and that contract is limited to the *south* half thereof. Even Crow's deposition and map, therefore, establish no more than that drilling operations were in fact conducted and that some took place at least near locations purportedly assigned to petitioners. Nothing in the record appears to tie drilling operations more closely to petitioners' locations.

drilling contracts and petitioners' testimony leave no doubt that petitioners did not intend to pool their investments with any other investors, or to risk their investments on production from any wells other than those ostensibly assigned to them individually. Nothing in the record suggests that any sort of agreement existed among the investors to participate in a joint venture, nor does it appear that at any time during the existence of the Pelco project was a suggestion made to any of the petitioners or the other investors that they were or ought to be pooling their investments with the other participants in the program.

Fred Luke testified that, although the Pelco program was not so represented to investors, he regarded Transmission as being in a nontechnical sense a trustee for the investors as a group with respect to proceeds from sale of oil and gas, since those proceeds were in fact being pooled financially by Transmission. While Luke's testimony is instructive of his view of the Pelco program's mechanics, it will not support a conclusion of law that the program amounted to a pooling operation, a trust arrangement, or a joint venture of some sort.

However, if it be assumed that irrespective of legal niceties, the Pelco program was in fact being operated for the joint benefit of its investors, it nonetheless does not follow under the circumstances before us that petitioners are entitled to deductions for intangible drilling and development costs. As the program was operated, each investor paid essentially the same amount for each drilling contract with Drilling and was promised essentially the same minimum return under each take or pay contract with Transmission. In practice, each investor was informed as a matter of course that oil had been found at his wellsite and began receiving payments at the minimum rate specified in the "take or pay" contracts, and these events were independent of actual drilling and development operations in the field. In *Edwin H. Haass,* 55 T.C. 43, 50 (1970), this Court stated with respect to section 1.612–4 of the regulations:

The regulations do not contemplate that investors in oil and gas wells drilled to production may be permitted to designate the costs of the interest in such wells as drilling and development expenses retroactively incurred, thereby being allowed a deduction for intangible drilling costs without assuming the risk of the unknown result of the drilling. * * *

On the facts before us, it seems clear that if the Pelco program is to be regarded as a pooled enterprise, the amounts invested were not placed at risk of the unknown results of future drilling: Investments would be lost only if and to the extent future drilling proved unproductive *and* production from wells already drilled and proved was insufficient to cover Transmission's financial guarantees. Because the drilling program was already in operation when petitioners invested in it, if the project is regarded as joint, each investment represented the purchase of an interest in existing production as well as a funding of future operations. If part of each payment was, under this view, risked on future drilling, the present record affords no basis for measuring its size, as opposed to the amount which would have to be considered a purchase of an interest in existing production.

Because of our resolution of the issues thus far considered, we need not address the additional questions raised by the parties. See, however, our discussion in *Heberer* relating to whether investors' $2,700 or $3,000 downpayments in the Pelco program may be more properly characterized as loans than venture capital placed at risk of drilling and production and whether investors' $10,800 or $12,000 notes may be considered to represent "payments" in the years the face amounts were borrowed from Leasing and the notes were executed.

It follows that decision should be entered for respondent in each of these cases, except the cases of the Douds and Pavels, which, because of stipulations with respect to other issues, will require computations under Rule 155.

> *Decisions will be entered for the respondent in docket Nos. 5573–72, 6879–72, 807–73, and 8864–73.*
>
> *Decisions will be entered under Rule 155 in docket Nos. 8700–73 and 450–74.*