BRUCE A. SANDERSON and DOROTHY SANDERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sanderson v. Commissioner
Docket No. 1324-73.
United States Tax Court
T.C. Memo 1977-40; 1977 Tax Ct. Memo LEXIS 399; 36 T.C.M. (CCH) 174; T.C.M. (RIA) 770040; 57 Oil & Gas Rep. 296; February 22, 1977, Filed Ivan R. Wainer, for the petitioners. *400 George W. McDonald, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' income taxes as follows: Taxable Year
Deficiency
1968
$48,102.39
1969
22,125.00
At issue is whether petitioners are entitled to a deduction for intangible drilling and development costs by virtue of their participation in a "drilling program" conducted by the "Pelco" group. FINDINGS OF FACT The parties have filed a stipulation of facts, which together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Bruce A. and Dorothy Sanderson, are a married couple who resided in Bonita, California, at the time they filed their petition in this case. They filed joint Federal income tax returns for the years 1968 and 1969. Bruce A. Sanderson is a physician actively engaged in the practice of medicine; he will sometimes hereinafter be referred to as petitioner. During 1968 and 1969, petitioners entered into a series of transactions hereinafter referred to as the "drilling program". The drilling program was conducted by three corporations, namely, *401 Petroleum Equipment Leasing Company (Leasing), Oil Field Drilling Company (Drilling), and Gas Transmission Organization (Transmission). Fred G. Luke was the president and chief executive officer of each corporation, and, during 1968 and 1969, all three companies had headquarters in Tulsa, Oklahoma. [1]
The drilling program was conducted generally as follows: An individual who desired to invest in the program would enter into a "turnkey" drilling contract with Oil Field Drilling Company. Petitioner signed 15 such contracts -- 8 during 1968 and 7 during 1969. Each of these contracts provided in material part: DRILLING CONTRACT
THIS AGREEMENT, by and between the person signing below, hereinafter called Owner, and Oil Field Drilling Co., * * * hereinafter called Contractor: * * *
1. Contractor agrees to drill one well in search for oil and/or gas * * * and to complete and equip such well if, in the opinion of Owner, after the drilling *402 and testing of such well, it will in all probability be productive of oil and/or gas in paying quantities, said well to be drilled at locations of Owner's choice on the following described lands, situated in : Section 246, Cuellar Lease, Zapata County, Texas. 2. Owner agrees to pay Contractor $13,500.00 for the drilling and testing and intangible cost of completion of one well. The sum of $2,700.00 payable on signing of this contract and balance upon completion. The $2,700 downpayment required by each drilling contract was supposed to be paid at the time the contract was signed. These downpayments were to be made from the investor's own funds. In many cases, however, petitioner's obligation to make the downpayment was waived in consideration for his efforts in acquainting others with the opportunity to invest in the oil exploration program. Thus, although petitioner entered into a total of 15 drilling contracts, he actually made downpayments in connection with only four of the eight 1968 contracts and none of the seven 1969 contracts. In cases where he made no downpayment his purported liability under the contract was reduced to $10,800 ($13,500 minus $2,700). *403 At some time after each contract was signed and the downpayment either paid or waived, petitioner was advised by letter that the drilling had been completed. These letters typically indicated that a successful well had been drilled, and as is more fully described below, petitioner completed his "investment" in connection with each of the drilling contracts. However, the record does not establish that the representation contained in these letters, i.e., that a successful well had been drilled, was truthful. The balance due on each contract (i.e., $10,800) was financed through a complicated set of related transactions. Petitioner would first execute a $10,800 promissory note payable to Leasing. Each note provided for payment of the principal plus eight percent annual interest in monthly installments over a two-year period. Upon the execution of the note, petitioner would also sign with Leasing, a lease for certain equipment necessary for the operation of the well. Each lease provided for a specified monthly rental over a term of five years. Simultaneously, petitioner would enter into a "take-or-pay" [2] agreement for the sale to Transmission of the oil or gas supposedly produced *404 by the well. The "take-or-pay" agreement provided that petitioner would receive, each month, at least a certain minimum payment which was purportedly attributable to his working interest in the well. When petitioner signed the notes, the leases, and the oil or gas purchase contracts, he received a signature card and other documents for the purpose of opening a checking account in his name at the National Bank of Commerce, Tulsa, Oklahoma. Petitioners were also asked to complete a financial statement. In accordance with instructions from Leasing, the bank opened an account in petitioner's name on December 30, 1968. Along with the documents used to open his account at the National Bank of Commerce, petitioner was also given two checks. One check in the amount of $75,650, was drawn by Leasing and was payable to petitioner. It was, on December 30, 1968, deposited in petitioner's newly opened account. This check was apparently attributable in large part to the promissory notes, payable to Leasing, *405 which petitioner had executed in connection with seven drilling contracts (7 X $10,800 = $75,600); the remaining $50 was an additional "loan" from Leasing, the reason for which is not disclosed by the record. The other check, in the amount of $75,600, was to be drawn by petitioner on his new account and was payable to Drilling. Petitioner signed the check to Drilling, and on December 30, 1968, it was paid by the bank. The second check covered petitioner's obligation for the balance due under seven of the drilling contracts. Substantially similar "two-check" transactions were undertaken in connection with the rest of petitioner's investment in the drilling program. During 1969, the following checks were drawn by Leasing and deposited in petitioner's account at the National Bank of Commerce: Check Description
Date Paid
Amount
Petroleum Equipment
11/14/69
$54,000
Leasing Co. "Loan
Account" ck. 318
Petroleum Equipment
11/14/69
21,600
Leasing Co. "Loan
Account" ck. 253
Petroleum Equipment
11/19/69
10,800
Leasing Co. "Loan
Account" ck. 326
And, the following checks, all payable to Drilling, were drawn by petitioner on that same account: Date Paid
Amount
11/14/69
$54,000
11/14/69
21,600
11/19/69
10,800
*406 In accordance with assurances received by petitioner at the time of his initial investment in the program, payments made by Transmission under each purchase contract were credited first against petitioner's obligations to Leasing under the promissory notes and the equipment leases; then any balance was deposited in petitioner's account in the National Bank of Commerce. During the years in which the three companies were in operation, the leases and notes executed by petitioner were in some cases sold or discounted to lending institutions, equipment suppliers, and oil well service companies. After such a discount or sale, Transmission would normally remit the appropriate portion of its monthly guarantee payments directly to the new holder of the note or lease in question. After an investigation by the SEC in or about March, 1970, Leasing, Drilling and Transmission executed a consent order agreement by which they promised to discontinue further sale of investment contracts in the drilling program. In March, 1970, they also filed voluntary petitions for reorganization under Chapter X of the Bankruptcy Act, and they have since gone into liquidation as bankrupts. Of the 15 promissory *407 notes executed by petitioner, in connection with the drilling program, 14 have been acquired by a trust created by petitioners in 1971 for the benefit of three of their adult children. The trust purchased these notes both from Leasing and also from various subsequent holders. Many, if not all of the notes thus acquired, were purchased at a substantial discount from their face amount. Although, petitioners have paid $85,547.64 pursuant to the terms of the notes, the record fails to show that the greater portion of such payments was not made to the trust. Drilling operations were actually conducted by the companies in Colorado, Kentucky, Louisiana, Ohio, Oklahoma, Texas and West Virginia. Petitioner claims that the following wells were drilled on his behalf: # 1090-1
E/2, Sec. 320, R. Crisp Survey,
Abstract 1639, Duval Co.,
Texas
# 1090-2
Sec. 12, Lots 1-10. Las Animas
Alberca de Abajo Surv.,
Jim Hogg Co., Texas
# 1090-3
Same as # 1090-2
# 1090-4
Section 496, Duval Co., Texas
# 1090-5
Section 496, Hoffman Field # 2,
Duval Co., Texas
# 1090-6
Dinn Lease, Duval Co., Texas
# 1090-7
Section 496, # 14, Duval County,
Texas
# 1090-8
Section 496, Well # 29, Duval Co.,
Texas
# 2025-1
J.C. Martin Lease, Bruni Field,
# E-1, Webb Co., Texas
# 2025-2
1/4 interest in Well #1, State
Tract 105 & 106, Copano Bay,
Fullton Beach Field, Aransas
Co., Texas
# 2025-3
1/4 interest in Well # 7, State
Tracts 105 & 106, Copano Bay
Fullton Beach Field, Aransas
Co., Texas
# 2025-4
Welder Heirs Lease, Seven Sisters
Field, # 8, Duval Co., Texas
# 2025-5
S/2, Section 110, # King-1, Survey
1688, Duval Co., Texas
# 2025-6
Section 11, Lopez Lease, # H-1,
Zapata Co., Texas
# 2025-7
Cuellar Lease, # 1-B, Sec. 245,
Zapata Co., Texas
*408 However, while drilling operations did take place in or near some of the locations purportedly assigned to petitioner, some locations were assigned to many investors and/or were never drilled. Moreover, the record fails to establish (a) that any specific wells were actually assigned to petitioner, (b) that any wells which were purportedly assigned to petitioner in fact existed, (c) that petitioner was either the only investor or even the first investor to whom any well which did in fact exist was assigned, or, (d) that any well, which in fact existed and which was actually assigned first to petitioner, had not been completed before petitioner made his investment in respect of that well. Petitioners claimed deductions for intangible drilling and development costs based on their participation in the drilling program as follows: Taxable Year 1968
1. Cash downpayments on four wells 4 X $2700
$10,800
2. Balance due on 7 wells, fi-
nanced by notes 7 X 10,800
75,600
3. Additional loan from Leasing (Not 50
50
Transferred to Drilling)
Total Deduction Claimed
$86,450
Taxable Year 1969
Balance due on 8 wells, financed
by notes 8 $10,800 $86,400
This amount *409 was then adjusted to
reflect "gross royalties, de-
pletion, interest, and equip-
ment rentals attributable to
the fifteen wells in question".
The record does not disclose the
precise nature of these adjustments,
but they resulted in a claimed net
deduction for 1969 in the amount of: $65,954 In his notice of deficiency, the Commissioner determined that -- the deductions of $86,450.00 for 1968 and $65,954.00 for 1969, claimed for intangible drilling costs are not allowable because you did not establish that the costs were incurred for an ordinary and necessary business expense. OPINION During 1968 and 1969, petitioners and other taxpayers separately participated in an oil and gas drilling program conducted by the Pelco group. As did other participating taxpayers, petitioners claimed deductions for intangible drilling and development costs which were purportedly incurred on the basis of, and attributable to, their own investment in the drilling program. And, as in the cases of other participants, the Commissioner disallowed the deductions claimed on this basis by petitioners. This Court has, in each of three previously decided cases, upheld the Commissioner's position *410 in respect of these deductions. Lloyd L. Cottingham, 63 T.C. 695 (consolidated case involving six married couples); Donald L. Heberer, T.C. Memo. 1974-139, 33 T.C.M. 626, Dale L. Gardner, T.C. Memo. 1976-337, 35 T.C.M. . Because petitioners have failed to distinguish, to any material degree, their situation from that of the taxpayers in those three cases, and for the reasons stated therein, we must sustain the Commissioner's disallowance of the deductions now claimed by petitioners.
The deductibility of intangible drilling and development costs is governed by section 1.612-4(a), Income Tax Regulations, promulgated pursuant to section 263(c), I.R.C. 1954.[3] Relevant portions of section 1.612-4(a) of the regulations read as follows: (a) Option with Respect to Intangible Drilling and Development Costs. In accordance with the provisions of section 263(c), intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development *411 of oil and gas properties may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas * * * [including] the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts.* * * In Lloyd L. Cottingham, supra, 63 T.C. at 706, this regulation was interpreted to allow the deduction -- only [of] expenditures actually made for drilling and developing *412 or completing a well on property in which the operator has a working or operating interest of the same sort as required for the depletion allowance deduction. [Citations omitted.] Thus, a taxpayer's right to a deduction for intangible drilling and development costs depends upon his having an "economic interest" in the property in respect of which the deduction is claimed. Commissioner v. Estate of Donnell, 417 F. 2d 106, 108-109 (C.A. 5); Commissioner v. Southwest Exploration Co.,350 U.S. 308, 313. Palmer v. Bender, 287 U.S. 551. To resolve the case now before us we need not even attempt to define precisely the complex outlines of the term "economic interest", for it has been held to require, at the minimum, a "link [between] specific contracts * * * [and] specific wells and drilling operations". Lloyd L. Cottingham, supra, 63 T.C. at 707. In addition, to be entitled to a deduction for intangible drilling costs the taxpayer must acquire this legally sufficient interest before the wells are completed so that by his investment, the taxpayer "[assumes] the risk of the unknown result of *413 the drilling". Erwin H. Haass, 55 T.C. 43, 50. Petitioner has, to be sure, attempted to identify each of "his" 15 wells as having been drilled on a more or less generally described location (see, supra, p. 9). Furthermore, the parties have stipulated that "drilling operations did take place in or near some of the locations purportedly assigned to petitioners". And petitioner testified that when he entered into each drilling contract, he did so without any knowledge that production had already been achieved from the well which supposedly related to that contract. However, the evidence presented herein to support these crucial elements of petitioner's case is no stronger than that which has been presented by other investors in the Pelco program and which has been heretofore rejected consistently as inadequate. Lloyd L. Cottingham, supra, 63 T.C. at 706-707; Donald L. Heberer, supra, T.C. Memo. 1974-139, 33 T.C.M. 626, 630-631; Dale L. Gardner, supra, T.C. Memo. 1976-337, 35 T.C.M. , . Certainly, a number of wells were drilled and completed during the course of the drilling program. *414 But petitioner has not proven that any of these wells were drilled for him on the basis of the funds he invested and that he thereby acquired an economic interest in one or more of them. Indeed, the record before us suggests most strongly that petitioner, just like other investors in the Pelco drilling program, never really risked his investment on the success of any particular well. Any return which he could have hoped to receive was never solely dependent on the oil or gas flowing out of specific wells which he had supposedly acquired. Therefore he is not entitled to a deduction for intangible drilling and development costs. [4]Lloyd L. Cottingham, supra, 63 T.C. 695; Erwin H. Haass, supra, 55 T.C. 43. *415 Recognizing the difficulty of his position, petitioner urges that he is entitled to the deduction in question because he, "in good faith, paid money for a contract to drill a well". In support of this contention, he relies on G. F. Hedges, Jr.,41 T.C. 695, a case which we think is plainly distinguishable from the one now before us. It was decided by the same judge who subsequently decided Cottingham and Heberer, and he obviously did not think that they were controlled by Hedges. There was no question in Hedges that the taxpayers had, by their agreement and their investment, acquired a working interest in specific wells. The only issue presented therein was what portion of the amount which the taxpayers paid for their working interest was deductible as intangible drilling and development costs since "the work of actually cutting the hole in the ground" cost the relevant partnership substantially less than the total amount it had charged investors for all the working interests. The holding of that case, which allowed the taxpayers to deduct their entire investment as intangible drilling costs, in no way suggests that such a deduction would be *416 allowable to one who has not acquired an economic interest in any identifiable well. And that is petitioner's situation herein. In a final effort to circumvent his inability to establish that he obtained the requisite interest in specific wells, petitioner argues that he was a "joint venturer in a pooled interest", and that he is entitled to the claimed deductions on that basis. However, this argument was considered and squarely rejected by this Court in Cottingham, supra, 63 T.C. at 708-709, which case must be regarded as controlling here. Decision will be entered for the respondent. Footnotes
1. These three corporations are sometimes referred to as the "Pelco group"; however, they should not be confused with a fourth entity, "Pelco Leasing Company" which in effect served as the California office for the drilling program.↩
2. In these "take-or-pay" contracts, Transmission, as the buyer, agreed to "receive and purchase or pay for, if not taken" at a set price specified quantities of oil or gas.↩
3. SEC. 263. CAPITAL EXPENDITURES. * * *
(c) Intangible Drilling and Development Costs in the Case of Oil and Gas Wells.-- Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.↩
4. Having so concluded, we need not consider an alternative argument urged by the Commissioner in support of his position, namely, that because of the close relationship between the three Pelco group corporations, the financing arrangements made in respect of the $10,800 balance due under each drilling contract amounted in substance merely to petitioner's giving his note to satisfy his liability and so did not constitute an act of "payment" in cash or its equivalent sufficient to justify a deduction by a taxpayer using the cash receipts and disbursements method of accounting. Compare Alan R. Rubnitz, 67 T.C. , (No. 45, January 6, 1977); Thomas Watson, 8 T.C. 569, 579; T. Harvey Ferris, 38 B.T.A. 312, 317, affirmed per curiam 102 F. 2d 985 (C.A. 2), with G. Douglas Burck, 63 T.C. 556, 559-560, affirmed 533 F. 2d 768 (C.A. 2) and Newton A. Burgess, 8 T.C. 47, 50. See also, Donald L. Heberer, supra, T.C. Memo. 1974-139, 33 T.C.M. at 631↩.